856 A.2d 767

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Charles MALLOY, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 03, 2002.

Decided Sept. 1, 2004.

430

Frank C. Arcuri, Esq., Washington, PA, for Charles Malloy.

Sandra Ilene Thompson, Esq., Brian Ray Sinnett, Esq., Hugh S. Rebert, Esq., Amy Zapp, Esq., for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice CASTILLE.

On March 23, 2000, a jury sitting before the Honorable John S. Kennedy of the Court of Common Pleas of York County

convicted appellant of kidnapping,[1] conspiracy to commit murder[2] and murder in the first degree[3] in connection with the shooting death of Arthur Irick. At the penalty hearing, the jury found a single aggravating circumstance—that the murder had been committed during the perpetration of a felony, kidnapping[4]—but no mitigating circumstances;[5] accordingly, the jury imposed a sentence of death.[6] On May 22, 2000, the trial court formally imposed the death sentence for first-degree murder. Additionally, appellant was sentenced to maximum consecutive sentences of ten to twenty years of imprisonment each for kidnapping and conspiracy.

Appellant appealed and on June 15, 2000, filed a timely Pa.R.A.P 1925(b) statement of matters complained of on appeal, raising ten issues. On June 5, 2001, appellant contacted his trial attorney, Richard Robinson, Esquire, advising counsel that he no longer wished counsel to represent him and that he wished to pursue ineffective assistance of counsel claims against him. On June 14, 2001, Frank C. Arcuri, Esquire, was appointed and he filed in this Court, *inter alia*, a petition to remand for an evidentiary hearing to establish a record for appellate review of ineffectiveness claims. The petition for remand was granted on July 27, 2001. The evidentiary hearing on appellant's ineffective assistance of counsel claims was held on October 23, 2001.

Appellant now raises eight issues of ineffective assistance of

1. 18 Pa.C.S. § 2901.
2. 18 Pa.C.S. § 903.
3. 18 Pa.C.S. § 2502(a).
4. 42 Pa.C.S. § 9711(d)(6).
5. Appellant notified the trial court that he was going to pursue three mitigating circumstances: (1) the age of the defendant at the time of the crime, 42 Pa.C.S. § 9711(e)(4); (2) the defendant acted under the substantial domination of another person, 42 Pa.C.S. § 9711(e)(5); and (3) any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense, 42 Pa.C.S. § 9711(e)(8). However, trial counsel actually argued only the first two mitigating circumstances to the jury. *See* N.T. 3/23/00 at 857–60.
6. 42 Pa.C.S. § 9711(c)(1)(iv).

counsel and trial court error.[7] For the following reasons, we affirm the verdict of guilt, but vacate the death sentence and remand for a new sentencing hearing.

## I. Sufficiency of Evidence

■■■■ Although appellant does not challenge the sufficiency of the evidence, in all cases where the death penalty has been imposed, this Court conducts a self-imposed review of the sufficiency of the evidence underlying the first-degree murder conviction. *See Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In reviewing the sufficiency of the evidence, the Court must determine whether the evidence admitted at trial, and all reasonable references derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, support the jury's finding of all the elements of the offense beyond a reasonable doubt. *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280 (2000) (citing *Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217 (1986)). Evidence is sufficient to support a conviction of first-degree murder where the Commonwealth establishes that the defendant acted with a specific intent to kill; that a human being was unlawfully killed; that the person accused was responsible for the killing; and that the killing was done with premeditation or deliberation. *See* 18 Pa.C.S. § 2502(a), (d); *see also Spotz,* 759 A.2d at 1283; *Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624, 626 (1991). "A specific intent to kill may be proven by circumstantial evidence; it may be inferred by the use of a deadly weapon upon a vital part of the victim's body." *Spotz,* 759 A.2d at 1283 (citing *Commonwealth v. Bond,* 539 Pa. 299, 652 A.2d 308, 311 (1995)).

Our independent review of the evidence establishes that during the late-night hours of November 7, 1996, Willie Gooding, Antoine Brown and appellant Malloy were standing outside of Crystal Brown's house on Franklin Way in the City of

7. We have reordered appellant's claims for purposes of clarity.

York. At the time, appellant was staying in Crystal's home. Three unidentified individuals dressed in sweatshirts with hoods approached appellant and his friends. Appellant began to walk away when one of the unidentified men said, "freeze," shot at appellant and then fled. Gooding, Antoine Brown and appellant then ran into Crystal's house. Crystal called the police, who responded.

A witness to this shooting, Shanika Williams, testified that she saw three people wearing "hoodies" and that she heard the gunshots. Williams further testified that she told appellant that she thought that Arthur Irick had committed the shooting. Appellant, Gooding and Antoine Brown later met up with Cory Rieara and discussed the shooting. They identified Irick and Terrence Murphy as potential shooters and that Murphy and Irick had reputations for being "stick-up kids," *i.e.*, people who rob drug dealers.

The four individuals then went looking for Irick and Murphy. Appellant rode in a Subaru driven by Antoine Brown while Rieara rode in a blue Pontiac driven by Gooding. Appellant spotted Irick talking on the phone at a gas station on Queen Street. Both cars circled the block and pulled into the gas station next to Irick, while he was still on the phone. The four men got out of the cars, approached Irick and asked him if he knew anything abut the shooting on Franklin Way. Irick responded that he had heard something about the shooting and that he was on his way to meet someone at the Starlight building who knew what had happened and that the four men could come with him. Irick then got in the back of the Subaru. On the way to the Starlight building, the men stopped at Rieara's apartment where Rieara retrieved a .25 caliber semi-automatic hand gun and gave it to Malloy.

Upon arriving at the Starlight building, Malloy and Irick exited the Subaru, went to the door and rang the bell. Receiving no answer, appellant and Irick walked back to the cars. Appellant became angry and struck Irick with the gun and forced him into the back of the Subaru. Both cars drove approximately 10 to 15 minutes away to the Warren Street lot on the east end of town. The vehicles pulled up side by side

and turned their lights off. Appellant then got out of the car and ordered Irick to also get out of the car. Irick resisted and begged Antoine Brown to help him. Rieara then came over and assured Irick that nothing was going to happen and he was just going to have to walk home. Irick then got out of the car and appellant grabbed him and brought him to the front of the car. While standing face-to-face, Malloy shot Irick four times in the head. After leaving the scene appellant disposed of the gun in the sewer.

On the morning of November 8, 1996, York City police received a report of a man lying in the parking lot on Warren Street. The police officers found Irick, deceased, lying on his back with substantial amounts of blood underneath his head. Four .25–caliber casings were recovered from around the body. An autopsy ruled the death a homicide with the cause of death as multiple gun shot wounds to the head. The victim had been shot once in the face and three times in the back of the head.

On September 23, 1998, Rieara was interviewed by the police in reference to the murder. He gave a statement to Agent William Miller and agreed to testify against appellant at trial and to take the police to the sewer where appellant had dropped the gun.[8] Detective Dennis Williams accompanied Rieara and Agent Miller to the sewer where they recovered the gun and sent it to ballistics for analysis. At trial, ballistics officer James Rottmund testified that his analysis revealed that the shell casings found at the scene of the murder were discharged from the gun recovered by Detective Williams.

In October of 1998, the Commonwealth filed murder charges against appellant. Federal authorities filed separate criminal charges based on the same incident, however, and arrested appellant in New York and returned him to Pennsylvania. Federal plea negotiations were unconsummated and appellant was released into the Commonwealth's custody on April 8, 1999. Detective Rodney George of the York Police

8. Rieara had earlier been interviewed by the police in May, 1998 and July, 1998 but did not make a statement regarding the murder during those interviews.

Department went to Harrisburg to arrest appellant. In the car traveling back from Harrisburg to York, Detective George advised appellant of his *Miranda*[9] rights. During the trip, appellant and Detective George discussed why appellant had declined the plea agreement offered by the U.S. Attorney's Office. Upon arriving in York, Detective George again advised appellant of his *Miranda* rights and appellant indicated that he understood his rights and read and signed a waiver card.[10] Appellant then gave Detective George a statement, admitting to the murder of Irick. Detective George reduced the statement to writing. Appellant stated that the statement was accurate, but refused to sign it.

The foregoing evidence is amply sufficient to establish beyond a reasonable doubt that the victim Arthur Irick was unlawfully killed, that appellant killed him, that he acted with the specific intent to kill when he shot the victim in the head four times, and that the killing was done with premeditation and deliberation.

## II. Guilt Phase Claims

### A. Claims of Trial Court Error

Appellant forwards multiple claims of trial court error. First, appellant argues that the trial court erred in allowing the Commonwealth to introduce evidence of his prior bad acts. Specifically, appellant claims that the trial court erred in granting the Commonwealth's motion *in limine* to introduce evidence of appellant's drug activity because there was no evidence that the murder was drug-related. Appellant further argues that even if the evidence was relevant, it should not have been admitted because its prejudicial effect outweighed its probative value.

9. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

10. Detective George did not have a waiver card on him when he picked appellant up in Harrisburg. Therefore, although appellant was advised of his *Miranda* rights on the way from Harrisburg, he did not sign the waiver card until he arrived in York. N.T. 3/13/00 at 20.

■ Generally, the admissibility of evidence is a matter of trial court discretion and a ruling thereon will only be reversed upon a showing that the trial court abused that discretion. *See Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110, 117 (2001) (citation omitted). Evidence is considered relevant if it tends to make the existence of a material fact more or less probable than it would be without the evidence. *See* Pa.R.E. 401. Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. *See* Pa.R.E. 404(b)(1); *see also Commonwealth v. Fisher*, 564 Pa. 505, 769 A.2d 1116, 1128 (2001), *cert. denied* 535 U.S. 906, 122 S.Ct. 1207, 152 L.Ed.2d 145 (2002). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, identity or intent to commit the offense charged. *See* Pa.R.E. 404(b)(2); *see also Stallworth*, 781 A.2d at 118.

■ A review of the trial testimony reveals only one reference that appellant was involved in drug-related activity. *See* N.T. 3/22/00 at 473 (witness James Hughes testified that he bought drugs from appellant). The other references to drug-related activity involved either appellant's co-conspirators or the victim. Prior to closing statements, appellant's trial counsel made a motion for a mistrial based upon the admission of evidence that the murder was drug-related. In denying the motion, the trial court noted, *inter alia*, that there was evidence that the victim and appellant's co-conspirators were involved in drug-dealing, but "there was very little testimony that [appellant] was involved in drug dealing." N.T. 3/22/00 at 730.

Neither the single reference to appellant's drug activity, nor evidence of the drug activity of others, was introduced to prove criminal propensity. Instead, the evidence was admitted in order to demonstrate the motive for the murder of Arthur Irick. Appellant argues that this murder was not drug-related, but rather, that he killed the victim because he believed that the victim had attempted to rob and shoot him earlier in the evening. While there was evidence of the

retaliation motive appellant cites, this was not the entire story. The Commonwealth's evidence demonstrated that the victim and his associates were "stick-up kids" who systematically robbed known drug dealers; that appellant and his co-conspirators knew this fact; that appellant and his co-conspirators were drug dealers; that the victim attempted to rob appellant earlier in the evening precisely because appellant and his co-conspirators were drug dealers; and that appellant murdered the victim in retaliation. Thus, the evidence of the drug-related activity, which was limited as to appellant's specific prior bad acts, was properly admitted to show that this killing did not occur in a vacuum, *i.e.* to demonstrate motive. *See, e.g., Commonwealth v. Hall,* 523 Pa. 75, 565 A.2d 144, 149 (1989) (evidence of past drug dealings admissible to demonstrate motive for murder). Moreover, given the limited nature of the references, and the fact that the evidence was not exploited for improper purposes, we conclude that the trial court did not abuse its discretion in determining that the probative value of the evidence outweighed any prospect of prejudice.

■■■ Appellant next claims that the trial court erred in admitting two photographs depicting the bullet wounds in the victim's head. Appellant argues that the photographs were inflammatory and prejudicial and, as a result, inadmissible under Pa.R.E. 403. The admissibility of photographs falls within the discretion of the trial court and only an abuse of that discretion will constitute reversible error. *See Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 405 (2003) (citing *Commonwealth v. Baez,* 554 Pa. 66, 720 A.2d 711, 726 (1998), *cert. denied,* 528 U.S. 827, 120 S.Ct. 78, 145 L.Ed.2d 66 (1999)). The test for determining whether photographs are admissible involves a two-step analysis. "First, the court must decide whether a photograph is inflammatory by its very nature. If the photograph is deemed inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly inflame the minds and passions of the jury."

*Baez,* 720 A.2d at 726 (citing *Commonwealth v. Marshall,* 537 Pa. 336, 643 A.2d 1070, 1075 (1994)).

Appellant notes that the photographs depicted (1) the wound to the victim's face and (2) three wounds to the back of his head. Appellant acknowledges that the Commonwealth introduced the photographs for the relevant purpose of demonstrating the stippling effect on the victim's head which shows that the victim was shot at close range. Appellant nevertheless argues that the trial court erred in admitting the photographs because they were inflammatory and the stippling effect could be adequately explained to the jury without the photographs. Appellant notes that, in fact, the Commonwealth presented expert testimony on the stippling effect, and therefore, he argues that the photographs were inadmissible as prejudicial and cumulative evidence.

The trial court held that admission of the photographs was proper because the stippling effect and the effect of the shooting at close-range, which was relevant to the charge of first-degree murder, could not be adequately explained without the photographs. While appellant asserts that the introduction of the two autopsy photographs was prejudicial, he does not offer any explanation as to why that is so. Additionally, although appellant correctly notes that Commonwealth experts testified that the stippling effect of the wounds depicted in the photos were a result of a close-range shooting, such indirect testimony does not inevitably render direct photographic evidence inadmissible. *See Commonwealth v. Begley,* 566 Pa. 239, 780 A.2d 605, 622–23 (2001) ("even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs") (quoting *Commonwealth v. Jacobs,* 536 Pa. 402, 639 A.2d 786, 789 (1994)); *see also Commonwealth v. Tharp,* 574 Pa. 202, 830 A.2d 519, 531–32 (2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 2161, 158 L.Ed.2d 736 (2004) (introduction of photographs was proper even though testimonial evidence to demonstrate injuries was available). There is no suggestion that the photographs were unnecessarily gruesome or inflammatory. Thus, the trial court did not err in

determining that the probative value of introducing this evidence to demonstrate that the victim was shot at close-range outweighed the potential prejudicial effect of the photographs.

Appellant next argues that the trial court erred in failing to suppress the inculpatory statement he made to Detective George on April 8, 1999. Appellant argues that the trial court erred in failing to suppress the statement because: (1) the record is devoid of an explicit waiver of appellant's *Miranda* rights; and (2) appellant had previously invoked his Fifth Amendment rights in a federal investigation/prosecution for the same murder and was represented by federally-appointed counsel when he made the statement to local authorities.

 "Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 842 (2003), *cert. denied*, 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004) (citations omitted); *see also Commonwealth v. Lark*, 505 Pa. 126, 477 A.2d 857, 859 (1984) (citation omitted). As the Commonwealth prevailed on the suppression motion, we only consider the evidence of the prosecution and so much of the evidence of the defense that remains uncontradicted. Where the record below supports the trial court's denial of the suppression motion, we are bound by those facts and will only reverse if the legal conclusions are in error. *See id.*

 Appellant first argues that, under the totality of the circumstances, his confession was neither voluntarily nor constitutionally obtained. Appellant claims that because Detective George failed to tape the interview and appellant refused to sign the statement there is nothing in the record to support that appellant explicitly waived his rights or adopted the written notes taken by Detective George. Brief for Appellant, at 40 (citing *Commonwealth v. Bussey*, 486 Pa. 221, 404 A.2d 1309, 1314 n. 11 (1979) (waiver of rights must be explicit as evidenced by oral, written or physical manifestation)). The

record reveals that appellant did explicitly waive his rights. Detective George took appellant into custody on April 8, 1999 at the United States Marshal's Office in Harrisburg. According to Detective George, he advised appellant of his *Miranda* rights and appellant orally waived those rights. Upon arriving in York, appellant was again advised of his *Miranda* rights. Thereafter, appellant read and signed a rights card, thereby explicitly waiving his rights. N.T. 3/22/00 at 714–15. After signing the rights card, appellant gave Detective George a statement regarding the murder of Arthur Irick. After completing his statement, appellant reviewed Detective George's reduction of the statement to written form, and although he stated that the statement was accurate, he refused to sign the statement. N.T. 3/22/00 at 721.

Appellant argues that by failing to sign the statement he did not explicitly waive his *Miranda* rights. This claim is spurious. The record demonstrates that Detective George read appellant his rights and appellant then read and signed the rights card prior to giving his statement. By signing the rights card, appellant gave an explicit, written waiver of his rights. The fact that he later refused to sign the statement, after stating that it was accurate, is of no avail. *See, e.g., Commonwealth v. Holloway*, 524 Pa. 342, 572 A.2d 687 (1990) (*Miranda* rights were knowingly and voluntarily waived even though appellant refused to sign statement given to detective who wrote it down). Appellant's explicit waiver of his *Miranda* rights was not vitiated by his later refusal to sign the statement reduced to writing by Detective George.

Appellant's second argument respecting the confession is that his constitutional rights were violated because he had invoked his right to counsel in federal proceedings on the same charge, Detective George was aware of such representation, and Detective George still sought to question him. Appellant submits that his Fifth Amendment right to counsel had attached and Detective George violated that right by questioning him on the Pennsylvania state charges. Brief for Appellant, at 40–43 (citing *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *McNeil v. Wisconsin*, 501

U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); and *Commonwealth v. Santiago*, 528 Pa. 516, 599 A.2d 200 (1991)).

This argument is waived because appellant failed to raise this particular challenge before the suppression court. Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Although appellant moved to suppress his statement, he did not raise the Fifth Amendment argument in the suppression motion or at the suppression hearing. Rather, appellant's theory below consisted entirely of the credibility-based argument, discussed above, that he never explicitly waived his *Miranda* rights or gave an incriminating statement to Detective George, but that Detective George manufactured the statement. N.T. 3/13/00 at 26–28.

In accordance with this Court's previous practice of relaxed waiver on direct capital appeals, we have discretion to reach alleged trial court errors which, although waived, are resolvable from the record. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *see also Freeman*, 827 A.2d at 393. Although this Court abrogated the practice of relaxed waiver in *Freeman*, the *Freeman* rule only applies prospectively. *See id.* at 403. This matter was briefed before *Freeman* was decided, and as a result, relaxed waiver is available. Appellant's defaulted Fifth Amendment claim, however, is not one that is appropriately subject to relaxed waiver. Because appellant did not raise the claim in his suppression motion, the Commonwealth was not placed on notice that it would have to respond to that claim and make an appropriate record. The record below, therefore, was not devoted to explicating this claim, and indeed, the Commonwealth specifically takes issue with appellant's representation of the facts concerning his federal custodial status, noting that the record does not support appellant's characterization. *See* Brief for Appellee, at 33. Thus, appellant's failure to raise and litigate his Fifth Amendment claim at the suppression stage has

resulted in a record which is incomplete at best. *See Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426, 434–35 (1997) *cert. denied* 525 U.S. 1005, 119 S.Ct. 519, 142 L.Ed.2d 430 (1998) (citations omitted) (finding relaxed waiver did not apply to appellant's suppression claim because he withdrew pre-trial motion to suppress and, as result, Commonwealth was denied opportunity to respond and this Court was left without proper evidentiary record). In addition, appellant's failure to raise the claim has deprived this Court of the trial court's review of the issue. It would be an abuse of relaxed waiver to permit appellant to manufacture a constitutional claim at this stage of the proceedings from a record which was devoted to a totally different issue. Accordingly, appellant's Fifth Amendment claim is waived.

■■■ Appellant's final claim of trial court error is that the court erred in denying his demurrer to the charge of kidnapping. The offense of kidnapping is defined as follows:

**2901. Kidnapping**

**(a) Offense defined.**—A person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:

\* \* \*

(2) To facilitate commission of any felony or flight thereafter.

(3) To inflict bodily injury on or to terrorize the victim or another.

18 Pa.C.S. § 2901(a). Appellant argues that the elements of kidnapping were not met because the ten to twelve blocks that the victim was transferred does not constitute a "substantial distance;" the movement of the victim did not increase the harm to him because it was incidental to the murder and "had no bearing on the evil at hand," thereby not meeting the substantial distance requirement; and the victim voluntarily

accompanied appellant. Appellant thus claims that he should have been acquitted on the kidnapping charge.

For purposes of the kidnapping statute, a substantial distance is not limited to a defined linear distance or a certain time period. *See Commonwealth v. Hughes*, 264 Pa.Super. 118, 399 A.2d 694, 696 (1979). The determination of whether the victim was moved a substantial distance is evaluated "under the circumstances" of the incident. *See Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1382 (1991), *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991). Further, "the guilt of an abductor cannot depend upon the fortuity of the distance he has transported his victim nor the length of time elapsed...." *Hughes*, 399 A.2d at 696.

The testimony at trial demonstrated that, as appellant and the victim were leaving the Starlight building, appellant became angry at the victim and struck him with the gun in order to force the victim to get back into the car. N.T. 3/22/00 at 612, 676. Additionally, witnesses testified that the victim was fearful and did not want to get back into the car. *See id.* After the victim was forced back into the car, he was transported approximately 10–15 minutes away to a secluded lot on the east side of town. Once the men arrived at the point of seclusion, the victim begged Antoine Brown for help, but he was then lured out of the car, whereupon appellant shot him in the head four times. The distance that the victim was transported during that 10–15 minute drive to the empty lot was a substantial distance for purposes of the kidnapping statute. *See, e.g., Hughes*, 399 A.2d at 698 (finding that kidnapping statute was satisfied when victim was removed a distance two miles away to an isolated area). Further, the jury was free to conclude that the reason appellant and his co-conspirators transported the victim to the secluded lot was to murder him. Moreover, the movement of the victim to a secluded part of town obviously increased the potential harm to him; indeed, it facilitated and resulted in his murder.

Appellant's claim that no kidnapping occurred because the victim voluntarily accompanied his killers is likewise specious. Although the victim may have volunteered to accompany

appellant and his co-conspirators to the Starlight building, it is clear that he was forced by appellant back into the car at gunpoint at the Starlight building. The fact that the victim originally accompanied appellant and his co-conspirators of his own volition does not negate his later kidnapping. *See, e.g., Commonwealth v. Begley,* 566 Pa. 239, 780 A.2d 605 (2001) (appellant found to have kidnapped victim even though it appeared that victim intended to accept job from him at location where her body was found). Thus, the Commonwealth presented evidence that the victim was transported, against his will, a substantial distance to an empty, secluded lot where he was pulled out of a car and murdered. Accordingly, the trial court did not err in denying appellant's demurrer to the kidnapping charge.

B. Claims of Ineffective Assistance of Trial Counsel

Appellant raises two claims of trial counsel ineffectiveness at the guilt phase. In *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), this Court abrogated the rule promulgated in *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977), which had required new counsel to raise claims of previous counsel's ineffectiveness at the first opportunity after new counsel entered the case. This Court in *Grant* announced a new general rule providing that a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Grant,* 813 A.2d at 738. The *Grant* Court recognized that claims of ineffective assistance of trial counsel were not well-suited for review on direct appeal because, by nature, many such appeals lack both a trial court opinion and an evidentiary record for the appellate court to review. While the *Grant* Court held that the new rule applies retroactively to "any other cases on direct appeal where the issue of ineffectiveness was properly raised and preserved," it also noted the prospect of potential exceptions to the general rule. *Id.* at 738 & n. 14.

One such exception was delineated in *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831 (2003). In *Bomar,* this Court noted that where the concerns highlighted in *Grant* did

not exist—*i.e.,* the claims of ineffective assistance of counsel were raised and fully developed at a hearing in the trial court at which counsel testified and the trial court addressed the claims in an opinion—this Court would proceed to address the ineffectiveness claims on direct appeal. *Bomar,* 826 A.2d at 854–55. This matter is controlled by the *Bomar* exception. Upon this Court's remand order, the trial court held an evidentiary hearing at which trial counsel testified regarding his strategy during the trial, and the trial court opinion addressed appellant's claims of ineffective assistance. Accordingly, the claims of ineffective assistance of counsel can be addressed on direct appeal.

Appellant forwards his ineffective assistance claims under both the federal and Pennsylvania Constitutions. He does not argue that a different test obtains under the two charters, but rather forwards a single argument as to each claim. In any event, the test for counsel ineffectiveness is the same under both charters: it is the performance and prejudice test set forth in *Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052 (1984). *See also Bell v. Cone,* 535 U.S. 685, 694–96, 122 S.Ct. 1843, 1850–52, 152 L.Ed.2d 914 (2002); *Commonwealth v. Busanet,* 572 Pa. 535, 817 A.2d 1060, 1066 (2002), *cert. denied,* 540 U.S. 869, 124 S.Ct. 192, 157 L.Ed.2d 126 (2003); *Commonwealth v. (Charles) Pierce,* 515 Pa. 153, 527 A.2d 973 (1987). To prevail on a claim that counsel was constitutionally ineffective, the appellant must overcome the presumption of competence by showing that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceeding would have been different. *See Commonwealth v. (Michael) Pierce,* 567 Pa. 186, 786 A.2d 203, 213 (2001); *Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326, 333 (1999). A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *(Michael) Pierce,* 786 A.2d at 221–22; *see also Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 701

(1998) ("If it is clear that Appellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone and the court need not first determine whether the first and second prongs have been met.").

Appellant first argues that trial counsel was ineffective for failing to interview witnesses or ascertain several witnesses' whereabouts in time for trial. Appellant first claims that Eric Banks had been named in Detective Barth's reports as implicating Murphy in the victim's murder.[11] Appellant admits, however, that Banks' appointed Public Defender had indicated to the trial court that Banks would invoke the Fifth Amendment if called as a defense witness. Appellant further submits that other witnesses, including Shawn Chance, Travis DeJesus, Dion Wilson and Charlie Rideout, would have corroborated the statements made by Banks to Detective Barth. Appellant states that the trial court was advised that although Dion Wilson and Travis DeJesus were known to be in the custody of the Department of Corrections, the defense had been unable to interview them or secure their appearance at trial. Appellant now claims that, because trial counsel failed to interview or locate the above witnesses, appellant was forced to face the jury without presenting any evidence or testimony. Appellant further argues that trial counsel's failure to interview these witnesses rendered counsel ineffective.

To prevail on a claim of ineffectiveness for failure to call a witness, the appellant must demonstrate that: (1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the witness' existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced appellant. *See Bomar*, 826 A.2d at 856 (citing *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 275 (2000), *cert. denied*, 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533(2000)). Appellant has failed to sustain his burden.

11. At the time of trial, there was an outstanding warrant for Murphy's arrest but he had not been apprehended.

450

■ First, with respect to Eric Banks, trial counsel noted at the evidentiary hearing that he secured discovery statements from Banks and intended to call him as a witness at trial. N.T. 10/23/01 at 35. Indeed, Banks appeared at trial, but as the trial transcript demonstrates, Banks refused to testify on the advice of his attorney, announcing his intention to invoke his Fifth Amendment right against self-incrimination in response to any questioning about the death of Arthur Irick. N.T. 3/23/00 at 739. Because Banks would only have invoked his Fifth Amendment rights, the trial judge ruled that he could not be called as a witness. Since Banks made himself unavailable/unwilling to testify, appellant's claim of ineffective assistance of counsel for failing to call Banks fails for lack of arguable merit.

■ Trial counsel was also not remiss for failing to call Chance, DeJesus, Wilson and Rideout. At the evidentiary hearing, trial counsel testified that while his private investigator located some potential witnesses to testify on appellant's behalf, there were issues at trial which prevented him from calling them. N.T. 10/23/01 at 31. Those issues were discussed fully at a conference where trial counsel stated that his investigator was unable to locate Chance or Rideout. Further, trial counsel reported to the trial judge that although DeJesus and Wilson were in the state prison system (albeit trial counsel could not locate which penitentiary DeJesus was in), trial counsel elected not to call them as witnesses because their testimony would have consisted of inadmissible double-hearsay. N.T. 3/23/00 at 735–39. Indeed, it appears that the only thing these "witnesses" would have testified to was in fact double-hearsay: i.e. that Banks had told them that Murphy allegedly had told Banks that Murphy was involved in Arthur Irick's murder. Notably, appellant failed to produce any of these witnesses at the evidentiary hearing and he does not now suggest that any of them would have provided other relevant and admissible testimony. Appellant has failed to demonstrate that the witnesses were available and prepared to cooperate; much less that, if they were, their testimony would have been relevant and admissible; and that the lack of their

hearsay testimony prejudiced appellant. Accordingly, appellant's ineffectiveness claim fails. *See (Michael) Pierce,* 786 A.2d at 213.

██ Appellant next claims that trial counsel was ineffective for failing to object to the prosecutor's repeated remarks which, he says, linked the fact that appellant and his co-conspirators were from New York with the allegation that they were involved in the drug dealing and violence in York County. In support of the argument, appellant cites to the following portion of the prosecutor's opening statement:

> In the last ten years or so, York County is no different than Lancaster, Harrisburg, and surrounding areas, they have been subject to an onslaught of people from New York coming down here, bringing their drugs down to your community to sell them, and along with those drugs they bring violence.

N.T. 3/21/00 at 345. Appellant alleges that similar comments were made during *voir dire,* during the case-in-chief, and in closing arguments. Appellant argues that these comments stigmatized him and created a fixed bias and hostility against him in the minds of the jury. Appellant claims that his trial counsel cannot have had a reasonable basis for failing to object to the comments.

The Commonwealth responds that, while it is true that the prosecutor referred to drug dealers from New York in his opening, and referred to appellant as a hoodlum in his closing, the record does not support that he made "continual" such references directed toward appellant. Rather, the other references concerned the victim or other witnesses. Thus, the Commonwealth argues that the references to appellant were isolated and not prejudicial and, thus, counsel was not ineffective. The trial court, in its opinion, deemed the references to appellant hailing from New York as not prejudicial. Trial counsel, at the remand hearing, echoed that he did not object because evidence of drug-activity on the part of appellant and his co-conspirators had been deemed admissible and he did

not believe that the references to New York were prejudicial "in and of [themselves]."

"Generally, a prosecutor is permitted to vigorously argue his case so long as his comments are supported by evidence and contain inferences which are reasonably derived from that evidence." *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 231 (1995). In this case, the drug motive was certainly relevant and the fact that appellant and his cohorts were from New York was, if not strictly relevant, not inherently prejudicial, either. To the extent that the prosecutor then generalized from the facts here to speak in his opening of an "onslaught," however, there was certainly a basis for trial counsel to forward an objection. Whether an "onslaught" existed was not remotely at issue; nor was it relevant to attempt to tie appellant's alleged conduct into some broader social problem involving outsiders coming into the county. In addition, this Court is not naïve as to the xenophobic appeal the prosecutor was making in choosing to argue this irrelevancy.

In this respect, this Court has noted that "a jury's determination must be based solely upon the evidence and not a prosecutor's emotional appeal or crusading incitation to . . . convince the jury that a certain verdict is necessary as a form of retribution for the ills inflicted on society by a certain class of people." *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 202–03 (1997), *cert. denied*, 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998) (citing *LaCava*, 666 A.2d at 237; *Commonwealth v. Crawley*, 514 Pa. 539, 526 A.2d 334, 344 (1987)). Thus, for example, this Court has disapproved of prosecutorial remarks that encourage the jury to render a guilty verdict or the death penalty in order to "send a message" to a wider audience. While the prosecutor here did not specifically implore the jury to "send a message" with a verdict of death, his comments regarding appellant and his co-conspirators bringing violence and drugs from New York to York County nevertheless trigger similar concerns about appealing to irrelevant factors. This Court has been critical of comments which

"urge the jury to ignore their sworn duty to decide a matter only on the proper facts presented in evidence and the applicable law." *Hall*, 701 A.2d at 203. We note, in strong terms, that prosecutors should avoid arguing irrelevancies.

Having said this, we are also cognizant that the question before this Court is not the propriety of the comments *per se*, but the response of counsel. As counsel noted, evidence of the drug and New York connection had been deemed admissible: given the proven facts of the case, the jury was going to be hearing about drugs and the drug motive. Although counsel certainly could have forwarded an objection to the remarks, we do not believe that, as a matter of strategy, he was constitutionally obliged to do so. The fact of the matter is that both appellant and the victim were involved in aspects of the drug trade; the task for the jury was to determine appellant's responsibility, if any, for the killing. Viewed in this light, it was not unreasonable for counsel to view the reference in the prosecutor's opening as insufficiently harmful to warrant an objection and the inevitable highlighting of the remark which an objection would have created. Moreover, counsel could reasonably trust in the jury's ability to follow the court's general charge emphasizing that the arguments of counsel were not evidence.

### III. Penalty Phase Claims

Appellant raises two claims concerning the penalty phase: (1) whether counsel was ineffective for failing to prepare for the penalty phase; and (2) whether appellant waived his right to challenge the jury instruction during the penalty phase. Because we find merit in the first argument and order a new penalty phase hearing, we do not reach the second.

Appellant claims that trial counsel was ineffective for failing to investigate and present mitigation evidence at the penalty phase. More specifically, appellant argues that counsel failed to investigate his background, failed to contact any of appellant's family members, and failed to present any character witnesses or, indeed, other mitigation testimony at the penalty phase. Appellant argues that the evidence that trial counsel

should have presented would have been admissible under 42 Pa.C.S. § 9711(e)(8): "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." [12]

It is well-established that "[c]ounsel has a duty to undertake reasonable investigations or to make reasonable decisions that render particular investigations unnecessary." *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 735 (2000), *cert. denied*, 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992) (citing *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984)). Similarly, "our principal concern in deciding whether [counsel] exercised 'reasonable professional judgmen[t]' is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [appellant's] background *was itself reasonable*." See *Wiggins v. Smith*, 539 U.S. 510, 522–23, 123 S.Ct. 2527, 2536, 156 L.Ed.2d 471 (2003) (emphasis in original) (citing *Strickland, supra*).

The question of capital counsel's duty respecting the investigation and preparation of mitigation evidence has been further explicated in the United States Supreme Court's recent decisions in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) and *Wiggins v. Smith, supra*. In *Williams*, trial counsel failed to begin preparation for the penalty phase until one week before trial began. Additionally, trial counsel failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' horrific childhood.[13] Additionally, the evidence would have

12. As with appellant's claims of ineffective assistance in the guilt phase, this claim of ineffective assistance at the penalty phase will be considered on direct appeal because it was addressed at appellant's evidentiary hearing. Therefore, it is reviewable under the *Bomar* exception to this Court's *Grant* rule.

13. The details of Williams' childhood included: his parents had been imprisoned for the criminal neglect of Williams and his siblings; he had been severely and repeatedly beaten by his father; he had been committed to the custody of the social services bureau for two years during his parents' incarceration; and he was returned to his parents'

demonstrated, *inter alia,* that Williams was "borderline mentally retarded," that Williams had received commendations while in prison for helping to crack a prison drug ring and returning a guard's wallet, and that Williams received a carpentry degree while in prison. Trial counsel did not investigate Williams' childhood because they incorrectly thought that state law prevented access to such records, not because of any strategic decision. *See Williams,* 529.U.S. at 395–96, 120 S.Ct. at 1514–15. On this record, the Court found that the state trial judge, in reviewing the claim during the state *habeas corpus* proceedings, did not err in finding that counsel was ineffective.

In *Wiggins,* counsel's investigation drew from: (1) tests of Wiggins by a psychologist finding that Wiggins had difficulty coping with difficult situations and had features of a personality disorder; (2) a written Presentence Investigation ("PSI") describing Wiggins' "misery as a youth" and observing that he spent most of his life in foster care; and (3) records from the Baltimore City Department of Social Services ("DSS") documenting Wiggins' placement in the state's foster care system. 539 U.S. at 523–24, 123 S.Ct. at 2536. Counsel decided not to expand their investigation beyond the PSI and DSS records and failed to commission a social history report, despite receiving funds for one from the local Public Defender's Association. The Supreme Court found that trial counsels' failure to follow-up and investigate these leads was objectively unreasonable. In so holding, the Court noted that trial counsel did not have a strategic basis for failing to investigate this potential mitigation evidence, but rather, their failure was a result of simple inattention. *See id.* at 524–26, 123 S.Ct. at 2537.

To determine whether counsel in the case *sub judice* was ineffective we start with a review of the investigation that counsel performed and the mitigation evidence he presented. *See Commonwealth v. Fears,* 575 Pa. 281, 836 A.2d 52, 72 (2003). The record, which includes counsel's testimony at the remand hearing, reveals that counsel conducted little investi-

custody after they were released from prison. *See Williams,* 529 U.S. at 395–96, 120 S.Ct. at 1514–15.

gation to prepare for the penalty phase. At the remand hearing, counsel was questioned regarding whether appellant was correct in remembering that counsel only visited him once while he was at York County Prison. In response, counsel stated "He may be. I can't say he is wrong." N.T. 10/23/01 at 38. In fact, counsel's time sheets—which were submitted to York County for reimbursement purposes—reflect that he only met with appellant at York County prison twice prior to trial for one and one-half hours for the first visit and two and one-half hours for the second visit, including travel time. Further, at the evidentiary hearing, counsel testified as follows:

Q: Did you at any time apply to the judge to have co-counsel appointed to at least help you with the death penalty phase of this case?

A: No.

Q: Did you at any time ask the Court for a death penalty investigator?

A: No, not specifically, no.

Q: Do you recall what you did in regards to the death penalty phase of this case and I am asking about your preparation?

A: In preparation not, quite honestly, not a lot. There wasn't a lot that I had.

N.T. 10/23/01 at 38. Additionally, the trial court asked counsel if he had ever sat down with appellant and discussed the availability of mitigation witnesses/evidence at the penalty phase, and the relevance of family testimony and information about his background for penalty phase purposes. Counsel responded, "I don't recall doing that." N.T. 10/23/01 at 43. It is apparent from this record that counsel undertook little or no affirmative effort aimed at the penalty phase of the trial.

Although counsel engaged in little or no investigation, and introduced no testimonial evidence in mitigation at the penalty phase, he did argue two record-based mitigation factors to the jury—(1) appellant's age at the time of the murder, which was stipulated as twenty; and (2) that appellant acted at the

substantial direction of another. N.T. 3/23/00 at 857–59. Appellant argues, however, that had counsel conducted a proper investigation, additional and important mitigation evidence concerning appellant's character and background would have been discovered. Specifically, appellant emphasizes evidence from the remand hearing to the effect that: (1) he suffered an abusive childhood at the hands of his mother and her boyfriend, including that the boyfriend burned his hand so severely that he still bears the scars; (2) he was removed to the care of his grandmother after his drug-addicted mother abandoned him; and (3) he was later institutionalized at age 12 by New York's Bureau of Child Welfare because his grandmother was unable to control him. N.T. 10/23/01 at 18–19. Appellant's mother, aunts and grandmother could have testified to these facts. Appellant admits that he never told trial counsel this information, but explained that counsel never asked about his background. *Id.* at 19–20.

The fact that there was mitigation evidence available concerning appellant's childhood was later corroborated in a presentence investigation report where the interviewer, Donna Becker, spoke to appellant's aunt, Royce Malloy. *Id.* at 27. Appellant's aunt stated that appellant was a good child and may have had a different life if only one of his parents had taken an interest in him. Additionally, Ms. Malloy stated that appellant was arrested at an early age, that appellant may have been abused by his stepfather at the age of 10, that appellant's mother and father had substance abuse problems, and that appellant was placed in a group home by juvenile authorities from ages 12 to 15. *Id.* at 27–28.

The Commonwealth argues that appellant's proffer below did not establish a reasonable probability that the result of the penalty phase would have been different. Confining itself to a prejudice argument, the Commonwealth apparently concedes that appellant has satisfied the performance prong of the *Strickland/Pierce* test. In the Commonwealth's view, the two "strongest" mitigators in appellant's favor—his age and the alleged duress under which he acted—were argued to the jury, which rejected them. In a brief *ipse dixit,* the Common-

wealth concludes that, since the jury rejected the proffered mitigators, they probably would have rejected the undiscovered affirmative mitigation evidence concerning appellant's background as well.

The trial court's analysis of the claim is not much more illuminating than the Commonwealth's. In finding that counsel was not ineffective the remand court noted that it had conducted a colloquy with appellant at appellant's sentencing at which appellant stated that he had made an informed decision not to testify at the penalty phase, and that there was nothing that he wanted his lawyer to do that counsel failed to pursue. From this exchange, the trial court concluded that trial counsel "prepared for the death penalty phase in accordance with the wishes of his client." *See* Trial Court Supp. Op. at 3.

Neither the Commonwealth's nor the trial court's analysis is persuasive. The fact that the jury rejected certain proffered mitigators—mitigators supported by a brief argument—does not mean that a full preparation of other relevant mitigation evidence might not have changed the result. Moreover, it is not self-evident that the proffered mitigators are objectively "stronger" than evidence of appellant's background. Counsel's duty encompasses pursuit of all statutory mitigators of which he is aware or reasonably should be aware, unless there is some objective, reasonable ground not to pursue the circumstance (such as when it might open the door to harmful evidence). Finally, we note that this was a close case in terms of the penalty. The Commonwealth proved a single aggravating circumstance. Counsel's task (at that phase) was to attempt to convince at least one member of the jury that there was at least one mitigating circumstance which should be accepted and weighed against the aggravator. We cannot simply assume, as the Commonwealth would have us do, that all of the jurors would have rejected **any** proffered mitigator merely because they rejected other mitigators which were very briefly argued.

The trial court's analysis likewise does not justify its denial of relief. The fact that appellant was satisfied with his counsel

at the sentencing hearing colloquy in no way proves that trial counsel's investigation and performance satisfied Sixth Amendment standards. Appellant is not a lawyer, nor was he in a position to know whether his counsel had performed competently. The measure of effectiveness is not whether one's client appeared satisfied at the time. A client is entitled to trust in the fact that his attorney will know what investigation to undertake, what leads to pursue, and what evidence to look for. It is one thing for a client to fail to cooperate when asked pertinent questions. But it is quite another if the lawyer either fails to realize, or realizes but fails to pursue, a course of investigation which the Sixth Amendment objectively dictates.

The fact that neither the Commonwealth nor the court below articulated a persuasive basis to uphold the denial of relief does not mean that appellant sustained his burden of proving counsel ineffective, of course. Nevertheless, we have little difficulty concluding that appellant has proved the performance prong of *Strickland* (arguable merit and lack of reasonable basis in Pennsylvania parlance). We recognize that the evidence presented by appellant at the evidentiary hearing was not so strong as the foregone "smoking gun" mitigation evidence at issue in *Williams* and, to a lesser extent, *Wiggins*. Nevertheless, appellant did prove that there were certain factors in his background which were easily discoverable and which could have been forwarded in mitigation had counsel undertaken even a minimal investigation. Additionally, counsel's overall "preparation" for the penalty phase was clearly lacking, as it consisted of minimal meetings prior to trial with no follow up and no production of testimonial evidence at the penalty phase. The onus is not upon a criminal defendant to identify what types of evidence may be relevant and require development and pursuit. Counsel's duty is to discover such evidence through his own efforts, including pointed questioning of his client. Accordingly, appellant's claim of trial counsel ineffectiveness has arguable merit. *See, e.g., Fears*, 836 A.2d at 72–73 (ineffectiveness claim had arguable merit where trial counsel failed to investi-

gate potential psychiatric evidence); *Commonwealth v. Meadows,* 567 Pa. 344, 787 A.2d 312, 326–27 (2001) (Saylor, J., concurring) (claim of ineffectiveness had arguable merit where trial counsel conceded that he failed to investigate basic areas of potential mitigation).

▇▇▇▇▇▇ It is well-settled that the reasonableness of a failure to investigate and present certain mitigation evidence can depend upon the information given to counsel by the defendant in the course of counsel's investigation. *See Commonwealth v. Williams,* 577 Pa. 473, 846 A.2d 105, 113 (2004); *Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 45 (2002) (citing *Commonwealth v. Uderra,* 550 Pa. 389, 706 A.2d 334, 340–41 (1998), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1465, 143 L.Ed.2d 550 (1999)); *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373, 383 (1986). "Thus, assuming a reasonable investigation, where there is no notice to counsel of particular mitigating evidence, he cannot be held ineffective of failing to pursue it." *Basemore,* 744 A.2d at 735 (citing *Commonwealth v. Howard,* 553 Pa. 266, 719 A.2d 233, 238 (1998)). However, it is also settled that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins,* 539 U.S. at 528, 123 S.Ct. at 2539 (quoting *Strickland* 466 U.S. at 690–91, 104 S.Ct. at 2066).

In this case, it is clear that the failure of counsel to pursue mitigation evidence of his client's background was not based upon strategy or any other objectively reasonable factors. The testimony at the remand hearing demonstrated that counsel failed to so much as conduct a cursory review of appellant's background. This is not a case where trial counsel had attempted to elicit relevant mitigation information from his client and family members, only to have childhood abuse, family problems, or other potential mitigation evidence within their knowledge not be mentioned. *Contrast Bond,* 819 A.2d at 47 (noting that trial counsel met with appellant and family members on numerous occasions and they failed to reveal childhood trauma to trial counsel). Indeed, the testimony below suggests that counsel did not pursue this tactic at all:

Q: Did you ever sit down with him and, you know, say if we get to the point where they are seeking the death penalty against you, we ought to try to get some people in to say good things about you. Is your mother around, is your grandmother around, do you have any other relatives to come down here and say you are a nice guy or you were a nice guy and give us some more background?

Did you ever talk to him at all about witnesses like that?

A: I don't recall doing that.

N.T. 10/23/01 at 43. Counsel's inaction was not caused by appellant and his family's failure to cooperate and supply such information. Although counsel cannot be ineffective for failing to investigate evidence which he had no reason to know existed, counsel still has an obligation to conduct a reasonable investigation to uncover such information.

 We now turn to whether trial counsel's deficient performance resulted in actual prejudice to appellant. To demonstrate prejudice, appellant must show that there is a reasonable probability that, but for trial counsel's errors, the result of the proceeding would have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Additionally, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins,* 539 U.S. at 534, 123 S.Ct. at 2542. Thus, in considering whether appellant was prejudiced we must consider not only the evidence and argument presented at the penalty phase, but also the evidence and argument that **would have been** presented at the penalty hearing had trial counsel properly investigated such evidence. *See Wiggins,* 539 U.S. at 536–37, 123 S.Ct. at 2543 (citing *Williams,* 529 U.S. at 397–98, 120 S.Ct. at 1515).

As noted above, the Commonwealth pursued a single aggravating circumstance at the penalty phase—that appellant committed the murder in the perpetration of a felony, namely kidnapping. In assessing prejudice, that single aggravating circumstance must be contrasted with the two mitigating

circumstances actually presented as well as the mitigating circumstance that counsel should have pursued—that appellant had been abandoned by his mother at a young age, abused by his mother's boyfriend at the age of 10, that his mother and father had a substance abuse problem and that he was institutionalized from the age of 12 until he was 15. Although we recognize that the unpursued evidence in this case is not the strongest, we further note that trial counsel's presentation at the penalty phase included no affirmative evidence **at all,** but only a brief argument and a stipulation. Such a performance, which was not motivated by any strategic decision, left the jury with a dry assessment of appellant's individual circumstances. In short, it is not just the failure to present evidence of appellant's background which concerns us, but the fact that the failure occurred in a case where there was little effort to personalize appellant for the jury. Indeed, personalizing appellant's background may have made one or more of the jurors more likely to accept the other mitigating circumstances which were pursued. We are satisfied that it is probable that at least one juror would have accepted at least one mitigating circumstance and found that it outweighed the Commonwealth's single aggravating circumstance. Thus, had the jury heard testimony and been able to consider all of the mitigation evidence and argument together, there is a reasonable probability that at least one juror would have struck a different balance and voted not to impose the death penalty. *See, e.g., Wiggins,* 539 U.S. at 536–37, 123 S.Ct. 2527, 2543, 156 L.Ed.2d 471. Accordingly, we agree with appellant that he was denied the effective assistance of counsel. As a result, appellant's death sentence is vacated and we remand this matter to the trial court for a new penalty hearing.