J-S17033-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| NAFEAST FLAMER, | : | |
| | : | |
| Appellant | : | No. 1108 EDA 2024 |

Appeal from the PCRA Order Entered March 8, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0007713-2009

BEFORE: MURRAY, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:          **FILED OCTOBER 15, 2025**

Appellant, Nafeast Flamer, appeals from the order entered in the Philadelphia County Court of Common Pleas, which denied his petition under the Post Conviction Relief Act ("PCRA").[1] We affirm.

The relevant facts and procedural history of this case are as follows. Allen Moment, Jr. ("Victim") was shot approximately 13-14 times on January 20, 2006, resulting in serious injuries. Victim remained in the hospital for most of the next two and a half years due to those injuries and ultimately died as a result on August 6, 2008. The Commonwealth charged Appellant, Marvin Flamer ("Co-defendant Flamer"), and Hakim Bond with first-degree murder, conspiracy, and related offenses in connection with Victim's shooting. Appellant and Co-defendant Flamer were tried together, and Mr. Bond was

_____

[1] 42 Pa.C.S.A. §§ 9541-9546.

tried separately. Co-defendant Flamer is Appellant's uncle and Appellant is Victim's cousin.

A jury trial commenced on January 14, 2014. The Commonwealth called Aisha Williams to testify. Prior to her testimony, the court placed Ms. Williams under oath and questioned her outside of the presence of the jury. Ms. Williams affirmed that she witnessed Victim's shooting and provided two statements to law enforcement about what she saw. She further acknowledged that on prior occasions when she was called to testify in this matter, she had recanted her statement and claimed that she did not see anything. Ms. Williams stated that she had recanted because she was afraid for her life. She further told the court that she would only be willing to testify at trial if the courtroom was cleared of all spectators. Based on her averments, the court found that there were no less restrictive conditions under which Ms. Williams would be able to testify and cleared the courtroom of all spectators prior to her testimony.

Ms. Williams testified that she has known Victim, Appellant, and Co-defendant Flamer for her whole life. She stated that on January 20, 2006, she saw Victim on the street and asked to purchase drugs from him. Victim told her that he would bring the drugs to her house later and she started to walk away from him. When she was walking, she saw Co-defendant Flamer driving up the street in a car. She also saw Appellant, Mr. Bond and a third person, all wearing dark hoodies, walk up behind Victim. At the time, Victim was talking to someone on the phone. When she neared the corner of the

street, she heard multiple shots. She turned around, saw that Victim was shot, and ran towards him. Victim stumbled down the street towards her and she caught him as he fell. Ms. Williams did not initially report what she saw to law enforcement because she was afraid. She subsequently provided statements to law enforcement, identifying Appellant, Mr. Bond and Co-defendant Flamer by photo. Ms. Williams affirmed that she was telling the truth at trial and during the two prior statements that she gave to law enforcement. Ms. Williams also affirmed that she was being untruthful when she recanted her statements under oath during previous proceedings in this case.

Detective Bill Urban testified that he interviewed Ms. Williams on March 17, 2008. Ms. Willaims' statement on that day aligned with her testimony at trial. Detective Angela Gaines testified that she interviewed Ms. Williams on a later date and Ms. Williams provided a statement that largely aligned with her prior statement and testimony at trial.

Shareem Nelson testified that he was good friends with Victim. At trial, Mr. Nelson stated that he did not see anything related to the shooting. He affirmed that his signature was present on a statement that was provided to law enforcement at an earlier date. Mr. Nelson largely recanted his prior statement and denied that he was doing so because he was afraid for his life.

Detective George Pirrone testified that he took a statement from Mr. Nelson on August 14, 2008. Mr. Nelson stated that he was on the street with Victim on the night that Victim was shot. Shortly after they separated, Mr.

Nelson saw four guys in black hoodies running towards Victim. He called Victim on the phone and told him that there were four guys coming towards him. Victim responded, "I'm cool, they are my peoples." Mr. Nelson returned to the area where Victim was and saw that Victim had been shot. Mr. Nelson went to the hospital where Victim was taken and told Victim's family members that Victim stated that "his peoples" shot him. Mr. Nelson understood this statement to mean that someone in Victim's family shot Victim. Mr. Nelson also reported that when he later visited Victim in the hospital, Victim told him that his cousin shot him.

Marquet Parsons, Victim's uncle, testified that on the night Victim was shot, Mr. Nelson came to the hospital. While there, Mr. Nelson stated multiple times that Victim's cousin shot Victim. Subsequently, Victim also told Mr. Parsons that Victim's cousin shot Victim.

Jeffrey Chandler, Jr. testified that he is Victim's brother and was present on the street when Victim was shot. He stated that Victim was on the phone when a few people ran up behind Victim. Victim was still on the phone when he turned around to look at the individuals who were coming towards him. Immediately thereafter, Victim was shot. Mr. Chandler stated that he could not identify who shot Victim because they were wearing dark hoodies. When he talked to Victim at the hospital, Victim told Mr. Chandler that Appellant and Mr. Bond shot him.

Dr. Carrie Sims, who was admitted as an expert in trauma and surgical critical care, testified that she had been treating Victim since he was brought

to the hospital on the night of the shooting. When Victim arrived at the hospital, he had sustained 13 to 14 bullet wounds, and his bowels were eviscerating out of his abdomen, requiring multiple surgeries. Victim remained in the hospital, on and off with periods of time at a rehabilitation facility, until he died. During that time, Victim's abdomen and legs had to be kept open to relieve pressure. Victim went into kidney failure, requiring dialysis. Victim required a tracheostomy and a constant foley catheter. Victim suffered from repeated infections and serious complications that required a craniotomy and cardiac surgery. Victim also had no movement of his lower extremities and limited movement of his upper extremities. Dr. Sims opined that Victim's case was the most horrific suffering she had seen in her career. Although Victim was suffering from serious physical injuries, he remained largely lucid, intelligent and articulate throughout.

Dr. Sims testified that sometime in late January or early February of 2008, she had a meeting with Victim and his close family. Dr. Sims was planning to go to a medical conference and scheduled this meeting beforehand to discuss Victim's prognosis and options because she was worried Victim would die while she was away. During this meeting, she told Victim and his family that she was concerned that Victim would not recover from his bacterial infection. She informed them that she believed Victim was not likely to live through this process or leave the hospital. Victim did not die while Dr. Sims was away but lived for several more months until August 6, 2008. Dr. Sims testified that she wrote a letter to the Assistant District Attorney ("ADA") on

December 19, 2008, which documented that she held this meeting with Victim and his family regarding her belief that Victim was critically ill and likely to die. Dr. Sims stated that she wrote this letter after Victim's death at the ADA's request.

Patricia Gooding, Victim's mother, testified that while he was in the hospital, Victim told her multiple times that his cousins shot him but refused to identify any names or talk to law enforcement regarding the shooting. Ms. Gooding confirmed that Dr. Sims had a meeting with Victim and their family in late January or early February of 2008, during which Dr. Sims informed them that she did not believe Victim would survive his injuries. After this meeting, Victim agreed to talk to law enforcement about the shooting and Ms. Gooding contacted a detective for this purpose. At this time, Victim had limited bodily functions, difficulty breathing and could not walk or use his hands. Nevertheless, Victim was lucid and mentally coherent. Detectives came to the hospital and interviewed Victim on February 4, 2008. Ms. Gooding and Mr. Parsons were present for this interview. Victim identified Appellant and Co-defendant Flamer by photo and Ms. Gooding signed the photographs to document Victim's selections. Ms. Gooding testified that Victim answered the questions of his own accord and was not directed or influenced by anyone in the room. Mr. Parsons also testified that Victim was not coached or directed by anyone in the room when answering the questions.

Detective Urban further testified that a note was left on his desk on February 1st or 2nd of 2008, informing him that Ms. Gooding called and stated

Victim wanted to speak with detectives. The note was marked as C-25 and shown to Detective Urban. He confirmed that the note also stated that Ms. Gooding requested that the detectives not speak with Victim without her present. On cross-examination, Appellant's counsel asked about this note and Detective Urban confirmed again that Ms. Gooding requested to be present when detectives spoke with Victim. After seeing the note, Detective Urban called Ms. Gooding and spoke with her on the phone. She informed him that Victim's doctor told them that Victim would not live much longer and Victim wanted to speak with detectives. Detective Urban set up an interview with Victim on February 4, 2008. Detective Urban, Detective Edward Tolliver, Ms. Gooding and Mr. Parsons were all present during this interview. Neither Ms. Gooding nor Mr. Parsons said anything while Detective Urban asked Victim questions. Detective Urban further confirmed that Victim answered the questions of his own accord and was not coached or directed by anyone in the room. Detective Urban returned to the hospital on February 14, 2008, and took a video of Victim identifying a photo of Appellant, Mr. Bond and Co-defendant Flamer.

Detective Edward Tolliver testified that he accompanied Detective Urban on February 4, 2008, when Victim was interviewed. Ms. Gooding and Mr. Parsons were also present for the interview. On this day, Victim had difficulty breathing, resulting in significant difficulty speaking verbally. Victim was also unable to move much of his body. Nevertheless, Victim was lucid and coherent, and it was evident that he understood what the detectives were

asking him. Victim nodded yes when asked if he knew who shot him. Victim was shown a photo array and asked to indicate if he saw a photo of the individuals who shot him. Victim nodded yes when shown Appellant and Mr. Bond's photographs. Victim also verbally consented when the detectives told him that Ms. Gooding and Mr. Parsons were going to sign the photographs that he selected. When asked if he knew anyone else involved, Victim stated that Co-defendant Flamer was the car driver. Detective Tolliver testified that Ms. Gooding and Mr. Parsons were standing behind Victim, outside of his view, and did not say anything during the interview. He further confirmed that no one in the room coached or directed Victim's answers.

Allen Moment, Sr., Victim's father, testified that he ran into Abdul Taylor in the spring of 2008 and asked him if he had anything to do with Victim's shooting. Mr. Taylor told him that Appellant, Mr. Bond and Co-defendant Flamer conspired to kill Victim. Mr. Taylor further stated that Appellant, Mr. Bond and Co-defendant Flamer all admitted to him that they were involved in the shooting. Mr. Moment testified that there was a feud between Victim's friends and Appellant and Mr. Bond. Victim was attempting to act as a peacekeeper between the groups to end the feud. While Victim was in the hospital, Mr. Moment asked him what happened. Victim told him that his cousins shot him. Victim further specified that that he was on the phone with Mr. Nelson and said, "These are my cousins, man. They all right." They started shooting at him and Victim tried to run away but Co-defendant Flamer blocked the alleyway.

Detective James Pitts testified that he interviewed Mr. Taylor on August 13, 2008. Mr. Taylor reported that two days prior to Victim's shooting, he heard Appellant and Mr. Bond planning to harm Victim, and they had multiple guns with them. Appellant and Mr. Bond believed that Victim set them up during a prior incident when someone shot at Appellant and Mr. Bond. A few days after Victim was shot, Appellant's best friend told Mr. Taylor that Appellant and Mr. Bond shot Victim. Detective Pitts confirmed that Mr. Taylor signed this statement. In May of 2010, Mr. Taylor was shot and killed. Detective Pitts testified that papers containing lyrics or poems written by Appellant were recovered from Appellant's prison cell. These lyrics contain content about violent acts that would be perpetrated against "rats" including, but not limited to, the following:

> When I get flicks of my baby mom with my son on her lap, I start to stress. I be wanting to snap because my manz on the streets, but not hunting the rat … that's telling on me. Motherfucker, I'm facing life. Stop sitting there dwelling on me. There crackers is fitting to drop a felon on me. The people I love the most bailing on me.
>
> \*    \*    \*
>
> I'm gonna introduce you to my … man Satan too. He want to meet you. He been patiently waiting, too. I'm tellin you don't like him an you been hating too. I then made a blind man walk off a cliff. I told a deaf man that his momma a bitch. I told a retarded man learn not to snitch or you going be with them rats and worms in a ditch.

(N.T. Trial, 1/16/14, at 143-44, 147).

Sabrina Taylor, Mr. Taylor's mother, testified that before Mr. Taylor was

shot, it became known in the neighborhood that Mr. Taylor provided a statement regarding Victim's case. She stated that Mr. Taylor told her that people had a hit out on him and were going to kill him.

Derrick White was convicted for shooting and killing Mr. Taylor. Malik Sutton testified that he heard Mr. White on multiple occasions talk about getting rid of Mr. Taylor because it was the only way to bring Appellant home. At some point, Mr. White learned about Mr. Taylor's statement and conversations about killing Mr. Taylor intensified. After Mr. Taylor was murdered, Mr. Sutton asked Mr. White if he killed Mr. Taylor, and Mr. White smirked in response.[2]

Appellant called Jeffrey Chandler, Sr. to testify in Appellant's defense. Mr. Chandler testified that he was Victim's stepfather. He stated that when he asked Victim what happened, Victim stated that his cousins did it. Mr. Chandler asked Victim if Appellant was the one who shot him, and Victim denied it. On cross-examination, Mr. Chandler stated that he believed Victim denied that Appellant had shot him because Victim was trying to cover for Appellant.

On January 23, 2014, the jury found Appellant guilty of first-degree murder, criminal conspiracy, carrying a firearm on the streets of Philadelphia,

---

[2] The parties stipulated that Mr. White visited Appellant in prison on multiple occasions and that Appellant spoke with Mr. White on the phone on multiple occasions.

and possessing an instrument of crime. The court ordered the preparation of a presentence investigation report and scheduled sentencing for March 14, 2014. At sentencing, Appellant's counsel highlighted the fact that Appellant was only 17 years old when he committed this offense and urged the court to impose a sentence that allowed for the possibility of parole. Appellant's counsel further highlighted the immaturity of Appellant's age, Appellant's susceptibility to negative influences and that Appellant did not complete high school. In arguing that Appellant had potential for rehabilitation, Appellant's counsel noted that Appellant had the support of a "stable family," highlighting that Appellant's mother was present in support of him and has done her best to provide for his needs. Appellant's counsel urged the court to impose a term of 35 years to life imprisonment. The court sentenced Appellant to life imprisonment without the possibility of parole on the first-degree murder conviction. The court imposed an aggregate sentence of 21 to 45 years' incarceration for Appellant's remaining convictions, to be served consecutively.

This Court affirmed Appellant's conviction on May 11, 2016. **See Commonwealth v. Flamer**, 299 EDA 2014 (Pa.Super. filed May 11, 2016) (unpublished memorandum), *appeal denied*, 661 Pa. 610, 237 A.3d 974 (2020). On March 9, 2016, Appellant filed his first PCRA petition. The court appointed counsel, who filed an amended PCRA petition, asserting among other things, that Appellant's appellate counsel was ineffective for failing to

file a petition for allowance of appeal with our Supreme Court. On January 31, 2020, the PCRA court reinstated Appellant's right to file a petition for allowance of appeal. On February 29, 2020, Appellant filed a petition for allowance of appeal *nunc pro tunc* and our Supreme Court denied Appellant's petition on August 12, 2020. ***See id***.

Appellant timely filed the instant PCRA petition on August 14, 2020, asserting various claims of ***Brady***[3] violations and ineffective assistance of counsel. On January 25, 2024, the PCRA court issued notice of its intent to dismiss the petition without a hearing pursuant to Pa.R.Crim.P. 907, and the court formally dismissed the petition on March 8, 2024. Appellant filed a timely notice of appeal on April 6, 2024. On April 9, 2024, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Appellant timely complied on April 30, 2024.

Appellant raises the following issues for our review:

> 1. The PCRA Court erred in dismissing claim one of the PCRA for lack of merit, wherein an email was discovered between ADA Richard Sax and Dr. Carrie Sims wherein [ADA] Sax advised Dr. Sims that her report was not sufficient to support the dying declaration he required in this matter. This is information that was not shared prior to trial, is evidence of [ADA] Sax effectuating change in evidence to support his assertion at trial and could have been used as impeachment evidence regarding the qualification of the video recorded "interview" of [Victim] as a dying declaration and was suppressed by the Commonwealth.

---

[3] ***Brady v. Maryland***, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. The PCRA Court erred in dismissing claim two of the PCRA for lack of merit, wherein evidence was discovered that [Victim's] mother, Patricia Gooding reached out stating that [Victim] was willing to give a statement, but this should not be done without her being present. This undoubtedly calls into question the nature and veracity of the statement, which was central to this case, especially given [the] method by which the statement was taken and presented to the jury in this matter.

3. The PCRA Court erred in dismissing claim three of the PCRA for lack of merit, wherein the Commonwealth failed to provide evidence of the significant issues regarding Detective James Pitts prior to trial, which ultimately led to his arrest and impending trial. The issues with Detective Pitts are absolutely meritorious and an evidentiary hearing should have been granted. The court erred in determining that because Detective Pitts never took a statement from the [Appellant] his misconduct is immaterial, he was, however, involved in taking the statement from Allen Moment which was central to this case and is currently awaiting trial on multiple charges of perjury and obstruction of the administration of law for misconduct in other matters, which is evidence of a course of conduct that is irrefutable and thus this claim has merit.

4. The PCRA Court erred in dismissing claim four raising an ineffectiveness claim regarding the failure of sentencing counsel to present mitigation at the time of sentencing wherein, the [Appellant] was a juvenile at the time the underlying homicide took place and thus was eligible for a non-life sentence pursuant to [**Miller v. Alabama**, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012)] and [**Montgomery v. Louisiana**, 577 U.S. 190, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016).] Here, the court erred in not only finding that this claim lacks merit, but also alleging that, "you conspired to successfully murder a witness in this case after your arrest" a mere allegation of criminal activity for which the [Appellant] was never charged and evidence that should never have been considered at the time of sentencing, let alone in consideration of a claim being raised in PCRA.

5. The PCRA Court erred in dismissing claim five as lacking merit, wherein the [Appellant] sought to incorporate evidence collected at an evidentiary hearing held on behalf of [Co-defendant] Flamer, wherein Ms. Aisha Williams testified on behalf of [Co-defendant] Flamer. The court avers that the testimony was incredible and therefore would not support either a *Brady* claim or after discovered recantation evidence. While [Co-defendant Flamer] and [Appellant] were codefendants and their convictions arise from the same criminal allegation, a hearing should have been granted on this claim to allow for an examination of Ms. Williams relating specifically to [Appellant].

(Appellant's Brief at 6-7).

Our standard of review of the denial of a PCRA petition is limited to examining whether the record evidence supports the court's determination and whether the court's decision is free of legal error. *Commonwealth v. Ford*, 947 A.2d 1251 (Pa.Super. 2008), *appeal denied*, 598 Pa. 779, 959 A.2d 319 (2008). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. *Commonwealth v. Boyd*, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). If the record supports a post-conviction court's credibility determination, it is binding on the appellate court. *Commonwealth v. Dennis*, 609 Pa. 442, 17 A.3d 297 (2011).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Glenn B. Bronson, we conclude Appellant's issues merit no relief. The PCRA court opinion comprehensively discusses and properly disposes of the questions presented.

- 14 -

Regarding Appellant's first issue, the court found that in the email chain between the ADA and Dr. Sims, the ADA merely asks Dr. Sims to provide documentation of the family meeting she had with Victim and his family regarding her belief that Victim would not survive for much longer. As the contents of the email chain aligned with Dr. Sim's testimony at trial, the emails have no value for impeachment purposes and do not constitute **Brady** material.[4] (**See** PCRA Court Opinion, filed 7/1/24, at 5-8).

_____

[4] Appellant argues in his brief that the emails constitute **Brady** material because they demonstrate that there was no documentation of the family meeting in Victim's medical records, Dr. Sims did not have a recollection of the exact date that she held the family meeting, and Dr. Sims wrote an addendum regarding the family meeting at the ADA's request. In the email chain, the ADA emailed Dr. Sims asking her if there was documentation of the family meeting she held with Victim and his family. The ADA further specified that he was looking for documentation of Victim's knowledge of his impending death, if true. Dr. Sims responded that she did not see any specific documentation of this meeting in Victim's medical records but that would not be abnormal. Dr. Sims further stated that she would be happy to write an addendum to that effect because she was certain that she had multiple conversations with Victim and his family about the topic. The ADA responded asking Dr. Sims to include any specific words or phrasing she recalled using to communicate to Victim that she believed he would not live for much longer. Dr. Sims responded with the addendum and also stated that although she did not see any documentation of the meeting in Victim's records, she was certain it occurred before she went on her trip.

The emails merely confirm Dr. Sims' testimony at trial. At trial, Dr. Sims testified that sometime in late January or early February of 2008, she held a meeting with Victim and his family where she informed them that she did not believe Victim would live much longer. Dr. Sims further testified that this meeting occurred before she went away on her trip. Dr. Sims testified that the addendum was written months later after Victim's death at the ADA's request. On this record, we agree with the PCRA court that the emails do not provide any basis to impeach Dr. Sims.

With respect to Appellant's second issue, the court found that Appellant failed to establish that the Commonwealth concealed the note from Victim's mother that was left on Detective Urban's desk because the Commonwealth presented the note as an exhibit at trial and Appellant's counsel cross-examined Detective Urban about the contents of the note. As such, the court determined that Appellant's second **Brady** claim was frivolous. (**See** PCRA Court Opinion at 9).

Regarding Appellant's claim that the Commonwealth violated **Brady** by failing to disclose that Detective Pitts was on the Commonwealth's "no call" list at the time of Appellant's trial, the court concluded that Appellant failed to establish that he was prejudiced by any such concealment. The court noted that Detective Pitts only testified to the statement made by Mr. Taylor and the papers that were taken from Appellant's jail cell. Excluding Detective Pitts' testimony, the Commonwealth presented compelling evidence of Appellant's guilt, including Victim's own statement, Ms. Williams' testimony, and Mr. Nelson's statement. Additionally, Appellant failed to present any evidence that Detective Pitts coerced or engaged in any misconduct towards any witness in this case. As such, the court concluded that Appellant failed to establish a **Brady** violation. (**See** PCRA Court Opinion at 9-11).

Regarding Appellant's ineffective assistance of counsel claim, the court

determined that Appellant failed to establish prejudice.[5] The court reviewed the newly developed mitigating evidence proffered by Appellant, along with all the evidence available for the court's consideration at the time of sentencing, and determined that Appellant's sentence would not have changed even if counsel had presented the additional mitigating evidence.[6] *See*

***Commonwealth v. Malloy***, 579 Pa. 425, 856 A.2d 767 (2004) (holding that in assessing prejudice at sentencing stage, court must reweigh evidence in

---

[5] Notwithstanding the phrasing of Appellant's issue in his statement of questions presented, the record makes clear that the court was aware at sentencing that Appellant was a juvenile at the time of the offenses at issue. As explained in the court's opinion, the court carefully considered all factors outlined in 18 Pa.C.S.A. § 1102.1(d) and decided that a life without parole sentence was appropriate here. (***See*** PCRA Court Opinion at 12-13). ***See also Commonwealth v. Felder***, ___ Pa. ___, 269 A.3d 1232 (2022) (holding that when imposing impose life without parole sentence for juvenile homicide offenders, sentencing courts are required to consider only relevant sentencing statutes, which will guarantee that sentencer considers juvenile's youth and attendant characteristics as required by ***Miller***).

[6] In support of his claim, Appellant presented a mental health evaluation report authored by Dr. Anna Lawler on September 17, 2019. This report details struggles in Appellant's upbringing. Specifically, Dr. Lawler notes that Appellant was born to very young parents. Appellant's father was incarcerated when Appellant was very young and another individual who became a father figure to Appellant died when Appellant was young. Appellant further witnessed some instance of domestic abuse against his mother. Appellant had difficulty in school, dropped out when he was in the ninth grade, and tested at a low level for math and reading skills. Appellant further developed behavioral issues and began living with his grandmother. Dr. Lawler also concluded that Appellant suffered from depression, which was largely untreated and manifested in an inability to adjust. On this record, we see no reason to disturb the court's conclusion that the mitigating evidence in Dr. Lawler's report would not have overcome the significant aggravating factors present in this case.

aggravation against totality of available mitigating evidence, including evidence and argument that would have been presented at sentencing hearing had trial counsel properly investigated such evidence). The court found that the proffered mitigating evidence would not have significantly impacted the court's sentencing decision when weighed against the significant aggravating factors present in Appellant's case, including the extreme suffering of Victim, multiple instances of witness intimidation, and Appellant's involvement in the murder of a witness.[7] (*See* PCRA Court Opinion at 11-14).

As to Appellant's claim that Ms. Williams recanted her testimony at a PCRA evidentiary hearing for Co-defendant Flamer, the court determined that an evidentiary hearing was not required in Appellant's case on this claim. The court concluded that Ms. Williams' testimony at Co-defendant Flamer's hearing was completely incredible and did not give rise to an issue of fact warranting

---

[7] Appellant cites to **Commonwealth v. Berry**, ___ Pa. ___, 323 A.3d 641 (2024) to support his claim that the court's reliance on Appellant's involvement in Mr. Taylor's murder during sentencing was improper. In **Berry**, our Supreme Court concluded that the trial court erred in considering the appellant's arrest record as a factor during sentencing because "arrests, without convictions, simply have no value as probative matter." **Id.** at ___, 323 A.3d at 655 (quotation marks omitted). In this case, however, the court did not impermissibly rely on Appellant's arrest record for unrelated matters but relied on the evidence that was presented and deemed admissible at Appellant's trial. As such, Appellant has failed to establish that the court erred in considering this evidence at sentencing.

an evidentiary hearing.[8] As Appellant did not proffer any credible support for his claims, he is not entitled to relief on his after discovered evidence and **Brady** claims based on Ms. Williams' recantation. (**See** PCRA Court Opinion at 14-17).

Our review of the record supports the court's analysis of Appellant's issues. **See Ford, supra**; **Boyd, supra**. Accordingly, we affirm based on the PCRA court's opinion.[9]

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>10/15/2025</u>

---

[8] The Honorable Glenn B. Bronson, who presided over Appellant's PCRA petition, also presided over Co-defendant Flamer's PCRA proceedings. As such, the court had the opportunity to observe Ms. Williams' recantation testimony and determined that it was completely incredible. Additionally, there is a history of witness intimidation in this case and Ms. Williams has admitted that she has previously falsely recanted her statements under oath in this case because she was afraid for her life. On this record, we discern no error in the court's determination that Ms. Williams' recantation testimony does not give rise to an issue of fact warranting an evidentiary hearing.

[9] We direct the parties to attach a copy of the PCRA court's opinion to any future filings involving this appeal.

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF        :      CP-51-CR-0007713-2009
PENNSYLVANIA             :
                                  :       **FILED**
      v.                     :       JUL   1 2024
                                    :
NAFEAST FLAMER           :       Appeals/Post Trial
                                        Office of Judicial Records

OPINION

BRONSON, J.                                                    July 1, 2024

Defendant Nafeast Flamer has appealed from this Court's order of March 8, 2024, dismissing his second petition under the Post Conviction Relief Act ("PCRA"). For the reasons set forth below, the Court's order should be affirmed.

## I.    PROCEDURAL BACKGROUND

On January 23, 2014, following a jury trial before this Court, defendant was convicted of one count each of first degree murder (18 Pa.C.S. § 2502), criminal conspiracy to commit murder (18 Pa.C.S. § 903), carrying a firearm on the streets of Philadelphia (18 Pa.C.S. § 6108), and possessing an instrument of crime (18 Pa.C.S. § 907). Defendant was tried with his uncle, co-defendant Marvin Flamer, while co-defendant Hakim Bond was tried separately. On March 14, 2014, the Court imposed an aggregate sentence of life in prison plus twenty-one to forty-five years incarceration in state prison. Defendant filed post-sentence motions, which the Court denied on July 10, 2014. Defendant timely appealed, and the Superior Court affirmed defendant's judgment of sentence on May 11, 2016. Defendant did not file a petition for allowance of appeal with the Pennsylvania Supreme Court. Defendant was represented at trial and on direct appeal by Bobby Hoof, Esquire.

0116_Opinion

On March 7, 2016, defendant filed a *pro se* petition under the PCRA ("First Petition"). On June 1, 2018, defendant filed a *pro se* amended PCRA petition. Gary Server, Esquire, was appointed to represent defendant on December 17, 2018. On September 19, 2019, defendant filed a counseled amended PCRA petition, alleging, among other things, that Mr. Hoof was ineffective for failing to petition the Pennsylvania Supreme Court for allowance of appeal. With the agreement of the Commonwealth, the Court reinstated defendant's right to petition for allowance of appeal on January 31, 2020. On February 29, 2020, defendant filed a petition for allowance of appeal, which the Supreme Court of Pennsylvania denied on August 12, 2020.

On August 14, 2020, defendant filed another petition under the PCRA ("Second Petition"), which is here at issue. On September 2, 2020, Edward Foster, Esquire, entered his appearance as privately retained counsel for defendant. On December 13, 2022, Emeka Igwe, Esquire, entered his appearance as co-counsel for defendant.

On October 14, 2022, defendant filed an amended petition ("October 2022 Amended Petition"). On December 22, 2022, the Commonwealth filed a motion to dismiss. On April 14, 2023, and May 22, 2023, defendant filed two supplemental amended petitions raising additional claims. Defendant consolidated these filings into one supplemental amended petition on May 24, 2023, and on July 2, 2023, the Commonwealth filed a response addressing defendant's additional claims.

On September 8, 2023, defendant filed yet another supplemental amended petition ("Comprehensive Second Petition") in which he included all claims, that is, defendant's original claims from the October 2022 Amended Petition, as well as defendant's additional claims from his May 24, 2023 filing. On November 3, 2023, the Commonwealth filed a motion to dismiss addressing all claims in defendant's Comprehensive Second Petition. On January 25, 2024, the

2

Court issued notice, pursuant to Pa.R.Crim.P. 907, of its intent to dismiss defendant's Second Petition without an evidentiary hearing ("907 Notice"). Defendant responded to the Court's 907 Notice on February 14, 2024 ("907 Response"). On March 8, 2024, the Court dismissed defendant's petition.

Defendant has now appealed the Court's dismissal of his Second Petition on the grounds that: 1) the PCRA court erred in dismissing defendant's *Brady* claim regarding the email chain between Assistant District Attorney Richard Sax and Dr. Carrie Sims; 2) the PCRA court erred in dismissing defendant's *Brady* claim regarding the handwritten note about the decedent's mother; 3) the PCRA Court erred in dismissing defendant's *Brady* claim regarding former Philadelphia Police Detective James Pitts; 4) the PCRA Court erred in dismissing defendant's claim that trial counsel was ineffective at defendant's sentencing; and 5) the PCRA Court erred in dismissing defendant's claims regarding Commonwealth witness Aisha Williams. *See* Concise Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b) ("Statement of Errors") at ¶¶ 1-5; Comprehensive Second Petition at ¶¶ 21-60. For the reasons set forth below, defendant's claims are without merit, and the Court's order dismissing defendant's Second Petition should be affirmed.

## I. FACTUAL BACKGROUND

The factual background of this case is set forth in the Court's original Rule 1925(a) opinion filed in defendant's direct appeal as follows:

> At trial, the Commonwealth presented the testimony of Philadelphia Police Detectives James Pitts, Edward Tolliver, George Pirrone, James Dunlap, Bill Urban, James Burke, Angela Gaines, and Gregory Santamala, Philadelphia Police Officers Paul Hogue, Ty'myra Cox, Jacarr Goodmond, Tony Waters, and Chris Lai, Deputy Sheriff Marquet Parsons, Associate Medical Examiner Dr. Aaron Rosen, Dr. Carrie Sims, Patricia Gooding, Shareem Nelson, Jeffrey Chandler, Sabrina Taylor, Allen Moment Senior, Aisha Williams, and Malik Sutton. Defendant presented the testimony of Jeffrey Chandler, Sr. Viewed in the light

3

most favorable to the Commonwealth as the verdict winner, the evidence established the following.

In early January, 2006, Allen Moment, Jr. was acting as peacemaker between two feuding groups of people in the area of 22nd Street and Pierce Street in Philadelphia, Pennsylvania.[1] N.T. 1/15/14 at 224. Moment was the cousin of defendant Nafeast Flamer and co-defendant Marvin Flamer. N.T. 1/15/2014 at 220-221; N.T. 1/17/14 at 75. During the ongoing feud, Moment arranged to meet with defendant Nafeast Flamer and Hakim Bond in order to return a firearm that Moment had taken from defendant. N.T. 1/14/14 at 86. Abdul Taylor encountered defendant and Bond as they waited for Moment. N.T. 1/14/14 at 85. Shortly after Moment failed to arrive at the meeting, defendant, Bond, and Taylor were fired upon by some unknown assailant. N.T. 1/14/14 at 85-86. Defendant believed that Moment had set them up, and told Taylor that defendant had been talking about "getting" Moment. N.T. 1/14/14 at 86, 138-139. On January 18, 2006, Taylor encountered a group of people in a lot on Ellsworth Street planning to go harm Moment. N.T. 1/14/14 at 83. Defendant and Bond were among this group. *Id.* Taylor saw approximately seven guns among the individuals. N.T. 1/14/14 at 84.

[1]Allen Moment, Jr. was also called Julio and Ribs. N.T. 1/14/14 at 83; N.T. 1/15/14 at 220.

On January 20, 2006, at approximately 8:50 p.m., Moment was walking on Pierce Street, near the intersection with 22nd Street, when he was approached by defendant, Bond, and two other individuals wearing dark hoodies. N.T. 1/14/14 at 132, 137; 1/15/14 at 88, 177-179, 180, 183, 225; 1/16/14 at 118. As this group approached Moment, a friend of Moment's, Shareem Nelson, called Moment and informed him of the group's approach. N.T. 1/14/14 at 134-135; 1/15/14 at 225-226; 1/16/14 at 19, 117, 1/17/14 at 71-72. Moment responded "I'm cool, they are my peoples." N.T. 1/15/14 at 177-179, 225; 1/16/14 at 19, 1/17/14 at 72. Once defendant and his companions reached Moment, the group opened fire on Moment, striking him approximately thirteen to fourteen times in the stomach, groin, and thigh areas. N.T. 1/14/14 at 156-157; 1/15/14 at 88, 180, 225, 1/16/14 at 118, 1/17/14 at 72. Co-defendant Marvin Flamer blocked Moment's possible escape with his vehicle. N.T. 1/15/14 at 88, 225-226, 1/16/14 at 71-72.

Tony Waters, an off duty police officer who lived in the area, heard the gunshots and called 911. N.T. 1/15/14 at 237. Police officers and paramedics arrived on the scene shortly thereafter and transported Moment to the Hospital at the University of Pennsylvania. N.T. 1/14/14 at 49; 1/15/14 at 55-56, 60. Doctors determined that Moment's bowel was eviscerating out of his abdomen and he was taken to surgery immediately. N.T. 1/14/14 at 156-157. Over the course of the next two and a half years in the hospital, Moment was treated by Dr. Carrie Sims and suffered kidney failure, an open wound in his abdomen, a perforated digestive

system, repeated infections, tracheostomy, fluid collection around his heart, depression, and a hemorrhagic stroke. N.T. 1/14/14 at 49, 158-162.

In late January, 2008, Dr. Sims called a family meeting in Moment's hospital room and informed Moment that, while he had put up a good fight, he was dying and that he would not be leaving the hospital. N.T. 1/14/14 at 51, 163-166, 1/16/14 at 59. While Moment could not move his body, Moment could communicate through head gestures and labored talking. N.T. 1/14/14 at 53-54; 1/15/14 at 96-97. After this meeting, Moment asked, after some insistence from his mother, to talk to a detective. N.T. 1/14/14 at 55. On February 4, 2008, Moment was interviewed by Philadelphia Police detectives in the presence of his mother, Patricia Gooding, and uncle, Marquet Parsons. N.T. 1/15/14 at 80-81, 137. In this interview, Moment identified defendant and Bond as the individuals who shot him. N.T. 1/15/14 at 87. Moment further identified co-defendant Marvin Flamer as driving the get-away car that had blocked him in. N.T. 1/15/14 at 88, 225. Moment identified all three individuals in photo arrays. N.T. 1/14/14 at 57, 58; 1/15/14 at 87; 1/16/14 at 67. Moment informed Parsons that he did not talk to police prior to this interview because he did not want to be "called a snitch." N.T. 1/15/14 at 139. On February 14, 2008, Moment provided a videotaped interview in his hospital room. N.T. 1/16/14 at 59-60. Moment eventually succumbed to his injuries and died on August 6, 2008. N.T. 1/14/14 at 47.

Following Moment's death, Abdul Taylor began cooperating with police and gave a statement on August 13, 2008. N.T. 1/14/14 at 80-81; 1/15/14 at 69. While this matter was pending for trial, Taylor's statement was distributed as part of discovery and was eventually seen by Derrick "Heavy" White. N.T. 1/17/14 at 31. Taylor informed his mother that he feared being called a snitch and told her that "they goin' kill me, they got a hit out on me." N.T. 1/15/14 at 47. While defendant was incarcerated, he received several visits from White. N.T. 1/16/14 at 158-159. White agreed to kill Taylor, as Taylor's testimony would prevent defendant from coming home. N.T. 1/17/14 at 30-31. On May 7, 2010, White shot Taylor in the head, killing him. N.T. 1/14/14 at 82, 1/15/14 at 73, 1/17/14 at 22.[2]

[2] The Court subsequently found that Taylor's statement to the police was admissible under the forfeiture by wrongdoing exception to the hearsay rule. Pa.R.E. 804(b)(6). N.T. 3/31/11 at 11-12; 1/15/14 at 205-207.

Trial Court Opinion, filed November 7, 2014, at pp. 2-5.

## II. DISCUSSION

An appellate court's review of a PCRA court's grant or denial of relief "is limited to

determining whether the court's findings are supported by the record and the court's order is

5

otherwise free of legal error." *Commonwealth v. Green*, 14 A.3d 114, 116 (Pa. Super. 2011) (internal quotations omitted). The reviewing court "will not disturb findings that are supported by the record." *Id.*

A. *Brady Claims*

Defendant claims that the Commonwealth engaged in multiple *Brady* violations by failing to disclose: 1) an email chain between Assistant District Attorney Richard Sax and Dr. Carrie Sims; 2) a handwritten note regarding the decedent's mother, Patricia Gooding; and 3) information that former Philadelphia Police Detective James Pitts was on a "no call" list at the time of defendant's trial. Statement of Errors at ¶¶ 1-3; Comprehensive Second Petition at ¶¶ 21-39.

Under *Brady v. Maryland*, 373 U.S 83 (1963), exculpatory evidence not disclosed to the defense will give rise to a due process violation and will require a new trial if the exculpatory evidence is "material" either to guilt or punishment. 373 U.S. at 87; *see also* Pa.R.Crim.P. 573(B)(1)(a) (specifying, as mandatory discovery, "[a]ny evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth"). If the police possess evidence that is favorable to the defense, then the Commonwealth is deemed to be responsible for its disclosure even if it is solely in the possession of the police. *See Commonwealth v. Lambert*, 884 A.2d 848, 854 (Pa. 2005).

Therefore, to establish a *Brady* violation, defendant must demonstrate that: "(1) the prosecution concealed evidence; (2) which was either exculpatory evidence or impeachment evidence favorable to him; and (3) he was prejudiced by the concealment." *Commonwealth v. Simpson*, 66 A.3d 253, 264 (Pa. 2013). In order to establish prejudice, defendant "must demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the

6

result of the proceeding would have been different. *Id.* A reasonable probability for these purposes is one which undermines confidence in the outcome of the trial." *Id.* (internal quotations and citations omitted). Moreover, "*Brady* evidence may not be cumulative of other evidence, cannot have been equally available to the defense, and cannot have been discoverable through the exercise of reasonable diligence." *Id.* (internal citations omitted).

### 1. *Email Chain*

Defendant claims that the Commonwealth committed a *Brady* violation by failing to disclose emails that were sent between ADA Richard Sax and Dr. Carrie Sims regarding the condition of Allen Moment at the time he made statements identifying who shot him. *See* Statement of Errors at ¶ 1; Comprehensive Second Petition at ¶¶ 21-26; October 2022 Amended Petition, Exhibit A. Defendant asserts that in the emails, ADA Sax made it "abundantly clear to Dr. Sims that he need[ed] some documentation . . . stating that when [Mr. Moment] was interviewed . . . Mr. Moment knew or believed he was dying, in order to allow the interview to be used as a dying declaration." Comprehensive Second Petition at ¶¶ 21-23. Defendant argues that Dr. Sims produced an addendum to this effect to "suit the needs of ADA Sax in order to allow the evidence to be admitted as a dying declaration," and that, had the emails been produced during pre-trial discovery, they could have been used by the defense "as impeachment evidence regarding the qualification of the video recorded 'interview' of the decedent as a dying declaration." Comprehensive Second Petition at ¶¶ 24, 26; Statement of Errors at ¶ 1. This claim is meritless.

Dr. Sims treated Mr. Moment at University of Pennsylvania Hospital for about two and half years before he eventually succumbed to the injuries he sustained in the shooting. N.T. 1/14/14 at 49, 157-162. In late January 2008, Dr. Sims called a "family meeting" in Mr.

7

Moment's hospital room and informed Mr. Moment that he was dying and that he would not be leaving the hospital. *Id.* at 51-52, 163-166. After the meeting, Mr. Moment asked to talk to a detective, and on February 4, 2008, Philadelphia police detectives interviewed Mr. Moment in the hospital. *Id.* at 55; N.T. 1/15/14 at 80-81, 136-138. In this interview, Mr. Moment identified defendant as one of the individuals who shot him. N.T. 1/14/14 at 56-57; N.T. 1/15/14 at 87; N.T. 1/16/14 at 59-64. Ten days later, on February 14, 2008, Mr. Moment provided a videotaped interview in his hospital room to detectives, memorializing his February 4th identification of defendant on video. N.T. 1/16/14 at 59-62. Defendant's statements were deemed admissible pursuant to the dying declaration exception, Pa.R.E. 804(b)(2), to the rule against hearsay.[1]

Contrary to defendant's assertion that the email chain between ADA Sax and Dr. Sims constituted *Brady* material, the email chain clearly establishes that neither ADA Sax's request, nor Dr. Sims' response, would have been helpful to the defense at trial. *See* October 2022 Amended Petition, Exhibit A. In the email chain, ADA Sax simply asked Dr. Sims to confirm in a writing what she had already told ADA Sax regarding Mr. Moment's health and her conversations with Mr. Moment, and to only do so "if true." *Id.* In response, Dr. Sims stated that she would happily include an addendum to Mr. Moment's medical records regarding her conversations because she was "certain [she] had multiple conversations" with Mr. Moment and his family regarding Mr. Moment's medical condition. *Id.* Thus, the email chain would not have impeached Dr. Sims' credibility, or the credibility of Dr. Sims' addendum, and therefore is not *Brady* material. *See Simpson,* 66 A.3d at 264. No relief is due.

---

[1] The Honorable Gwendolyn Bright, to whom this case was originally assigned, ruled *in limine* that defendant's statements were admissible as dying declarations pursuant to Pa.R.E. 804(b)(2).

8

## 2. *Handwritten Note*

Defendant claims the Court erred in dismissing his claim that the Commonwealth committed a *Brady* violation by failing to disclose a handwritten note prior to trial which indicated that Mr. Moment's mother, Patricia Gooding, contacted detectives on Mr. Moment's behalf. *See* Statement of Errors at ¶ 2; Comprehensive Second Petition at ¶¶ 27-32; October 2022 Amended Petition, Exhibit C. The note stated that Mr. Moment wanted to speak to detectives, but that Ms. Gooding did not want anyone to speak to Mr. Moment outside of her presence. *See* October 2022 Amended Petition, Exhibit C. Defendant argues that because Mr. Moment was an adult, Ms. Gooding's insistence that she be present during his interviews is "troubling," and that had this note been disclosed to the defendant, trial counsel could have used the note to attack the independence of Mr. Moment's statements. *See* Statement of Errors at ¶ 2; Comprehensive Second Petition at ¶¶ 27-31.

This argument is frivolous. The Commonwealth offered the handwritten note into evidence at trial, and defense counsel highlighted the contents of note during the cross-examination of Detective Bill Urban. *See* N.T. 1/16/14 at 57-58, 83; N.T.1/17/14 at 63-64; Commonwealth Exhibit C-25 (Note from Patricia Gooding). Defendant never objected to the note's admission nor indicated to the Court at trial that the note had not been passed timely in discovery. Defendant is not entitled to relief under *Brady* since the record establishes that the Commonwealth did not conceal the note and that it was presented to the jury during the trial.

## 3. *Detective Pitts*

Defendant alleges that former Philadelphia Police Detective James Pitts "threatened, intimidated, and physically abused him during the interrogation process." Comprehensive Second Petition at ¶ 34. As a result, defendant claims that the Commonwealth violated *Brady* by

9

not disclosing that Detective Pitts was on the Commonwealth's "no-call" list at the time of defendant's trial. *See* Statement of Errors at ¶ 3; Comprehensive Second Petition at ¶¶ 33-39.

This claim is without merit. While Detective Pitts did testify at defendant's trial, he only provided testimony regarding the statement made by Abdul Taylor, *see* N.T. 1/14/14 at 74-99, as well as testimony regarding the writings seized from defendant's jail cell that implicated defendant in the murder of Mr. Taylor. *See* N.T. 1/16/14 at 136-159. Detective Pitts never testified as to any statement made by defendant, and no statement made by defendant surfaced at trial. Additionally, no witnesses in defendant's case claimed to have been coerced by Detective Pitts.

Moreover, there was compelling evidence of defendant's guilt presented at trial that was unconnected to Detective Pitts. This was summarized as follows by this Court in its opinion regarding the meritless weight of the evidence claim defendant made on direct appeal:

> Shareem Nelson, Jeffrey Chandler, Jr., and Aisha Williams each testified that they witnessed multiple individuals in dark hoodies approach Moment at the corner of 22nd Street, where they shot Moment multiple times in the abdomen, pelvis, and upper thighs. N.T. 1/14/14 at 113-115, 134-136, 156-157; 1/15/14 at 178-180. Aisha Williams, who knew defendant all her life, identified defendant as one of those individuals. N.T. 1/15/14 at 180-181. Just prior to the shooting, after Nelson telephoned Moment to warn him that four men in hoodies were "running toward [him]," Moment told Nelson, "I'm cool, they are my peoples." N.T. 1/16/14 at 19. While hospitalized, Moment stated repeatedly that he had been shot by his cousins, without identifying them by name. N.T. 1/14/14 at 51; 1/15/14 at 139. Later on, when he believed he was about to die as a result of the extensive and lingering wounds which he sustained, Moment identified defendant and Bond as the shooters and Marvin Flamer as the driver of the get-away car. N.T. 1/14/14 at 51, 55-58; 1/15/14 at 86-88; 1/16/14 at 59, 67. When Taylor's statement to the police implicating defendant was distributed as discovery, after repeated phone calls with defendant, Derrick "Heavy" White killed Taylor "in order to get [defendant] ... home." N.T. 1/15/14 at 206-207; 1/17/14 at 31, 57-59.

Trial Court Opinion, filed November 7, 2014, at pp. 5-6. Accordingly, evidence that Detective Pitts was on the Commonwealth's "no-call" list would not be likely compel a different verdict in

this case. Therefore, the Commonwealth's failure to disclose the evidence did not violate *Brady*. *See Brady*, 373 U.S. at 87; *Simpson*, 66 A.3d at 264. No relief is due.

B. *Ineffective Assistance of Trial Counsel at Sentencing*

Defendant alleges that this Court erred in dismissing his claim that trial counsel, Bobby Hoof, Esquire, rendered ineffective assistance of counsel at defendant's sentencing hearing. *See* Statement of Errors at ¶ 4; Comprehensive Second Petition at ¶¶ 40-57. Defendant claims that Mr. Hoof was ineffective for failing to present adequate mitigation evidence at defendant's sentencing hearing and for mischaracterizing defendant's childhood, which led the Court to impose a life sentence.[2] *See* Statement of Errors at ¶ 4; Comprehensive Second Petition at ¶¶ 40-57. Defendant also argues that the Court should not have considered defendant's role in conspiring to murder a witness in its evaluation of defendant's claim. Statement of Errors at ¶ 4. Defendant's claim is without merit.

Under Pennsylvania law, counsel is presumed to be effective and the burden to prove otherwise lies with the petitioner. *Commonwealth v. Basemore*, 744 A.2d 717, 728 (Pa. 2000), n.10 (citing *Commonwealth v. Copenhefer*, 719 A.2d 242, 250 (Pa. 1998)). To obtain collateral relief based on the ineffective assistance of counsel, a petitioner must show that counsel's representation fell below accepted standards of advocacy and that as a result thereof, the petitioner was prejudiced. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In Pennsylvania, the *Strickland* standard is interpreted as requiring proof that: (1) the claim underlying the ineffectiveness claim had arguable merit; (2) counsel's actions lacked any reasonable basis; and (3) the ineffectiveness of counsel caused the petitioner prejudice. *Commonwealth v. Miller*, 987 A.2d 638, 648 (Pa. 2009); *Commonwealth v. Pierce*, 527 A.2d

---

[2] Although defendant was convicted of first degree murder, because he was a juvenile at the time of the homicide he was eligible for a non-life sentence pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012) and *Montgomery v. Louisiana*, 577 U.S. 190 (2016).

973, 975 (Pa. 1987). To satisfy the third prong of the test, the petitioner must prove that, but for counsel's error, there is a reasonable probability that the outcome of the proceeding would have been different. *Commonwealth v. Sneed*, 899 A.2d 1067, 1084 (Pa. 2006) (citing *Strickland*, 466 U.S. at 694). If the PCRA court determines that any one of the three prongs cannot be met, then the court need not hold an evidentiary hearing as such a hearing would serve no purpose. *Commonwealth v. Jones*, 942 A.2d 903, 906 (Pa. Super. 2008).

Here, defendant premises his claim on mitigating evidence developed several years after the sentencing hearing by psychologist Dr. Anna Lawler, who submitted a September 17, 2019 mental health evaluation of defendant. Comprehensive Second Petition at ¶ 46. He contends that Dr. Lawler's report proves that Mr. Hoof seriously prejudiced the defendant when he mischaracterized defendant's childhood at the sentencing hearing. *See* Comprehensive Second Petition at ¶¶ 40-57. In particular, defendant claims that Mr. Hoof represented to the Court that defendant had a stable upbringing, when in fact, he had a troubled upbringing. *Id.* Defendant also argues that numerous mitigating factors revealed in Dr. Lawler's report should have been uncovered and presented to the Court at the time of sentencing by competent counsel. *See* Comprehensive Second Petition at ¶ 40-46 & Exhibit B.

Defendant's claim of ineffective assistance of counsel fails because the sentence of the Court would not have changed even if the mitigating factors in Dr. Lawler's report had been presented at the time of sentencing. In rejecting defendant's claim on direct appeal that the sentence of the Court was excessive, the Court analyzed the relevant factors as follows:

> Because defendant was seventeen years old at the time of the murder here at issue, his sentence on the murder charge was governed by 18 Pa.C.S. § 1102.1. For first degree murder, section 1102.1(a)(1) provides that juveniles over the age of 15 shall be sentenced either to a term of imprisonment having a mandatory minimum of 35 years to life, or to life imprisonment without parole. In determining the appropriate sentence, the sentencing court is required to

consider, and to make findings regarding, numerous factors regarding the impact of the offense on the victim and the community, the safety of the community, the nature and circumstances of the offense, the degree of defendant's culpability, and numerous age-related characteristics of the defendant, which are delineated in the statute. 18 Pa.C.S. § 1102.1(d).

Here, the Court sentenced defendant to life in prison plus a consecutive twenty-one to forty-five years incarceration. At the sentencing hearing, the Court explicitly considered, and made findings regarding, all of the sentencing factors set forth in section 1102.1(d). N.T. 3/14/14 at 17-21. Important factors included the very unusual suffering of the victim, who lived for an extended period of time suffering horribly before he succumbed to his injuries. N.T. 3/14/14 at 18. Defendant, in the view of the Court, posed a grave threat to the safety of the public and had the highest degree of culpability in this case as he was one of the individuals who shot Moment. N.T. 3/14/14 at 18-19. Defendant's age at the time of the murder was seventeen, which was near the top of the applicable sentencing age range. N.T. 3/14/14 at 19. Defendant demonstrated a high degree of criminal sophistication in this matter, as he worked to eliminate a witness in this matter, Abdul Taylor. N.T. 3/14/14 at 19-20. Defendant also had a significant history of nine misconduct charges while in prison, and secured the murder of a witness while incarcerated. N.T. 3/14/14 at 20. After careful consideration of the presentence report and all of the mitigating evidence presented by the defense, the Court concluded that this was an "unusual case," and that defendant was incapable of rehabilitation. N.T. 3/14/14 at 16-21. The record fully supported that conclusion and justified the imposition of a sentence of life without parole.

Trial Court Opinion, filed November 7, 2014, at pp. 18-19.

In analyzing defendant's claim that Mr. Hoof was ineffective at sentencing, the PCRA court reviewed and considered all of the evidence available at the time of the sentencing hearing, along with all of the newly developed mitigating evidence proffered by defendant in the Second Petition. *See* 907 Notice at ¶ 4. The Court confidently concluded that the additional mitigating evidence would not have changed the decision of the Court to impose a life sentence. *Id.* This was an extraordinary case which included prolonged and unimaginable suffering of the victim and the killing of a witness. Defendant was not prejudiced at the hearing by Mr. Hoof's failure to uncover and present to the Court the mitigating evidence presented in Dr. Lawlor's report.

13

Moreover, there is no support for defendant's claim that the Court improperly considered that defendant conspired to kill a witness to the murder at issue in the case. The relevance and the admissibility of this evidence was ruled on by the Superior Court in granting the Commonwealth's appeal of a trial court order granting defendant's motion *in limine* to exclude much of the evidence to prove the conspiracy. *Commonwealth v. Flamer*, 53 A.3d 82, 86-89.[3] The Commonwealth proved the conspiracy at trial with compelling evidence of defendant's involvement. In particular, as stated above, the Commonwealth proved that defendant received several visits from Derrick White before Mr. White shot the witness, Abdul Taylor, in the head, killing him. N.T. 1/14/14 at 82; 1/15/14 at 73; 1/16/14 at 158-159; 1/17/14 at 22. Before the killing, Mr. Taylor, who had been cooperating with police, informed his mother that there was a "hit out" on him as a result of his cooperation against defendant and his codefendant, Marvin Flamer. N.T. 1/15/14 at 47. Mr. White was heard saying that he was going to kill Mr. Taylor "in order to get Nafeast and them home." N.T. 1/17/2014 at 31.

Accordingly, there was compelling evidence that this was an extraordinary case that fully justified a life sentence notwithstanding anything submitted by Dr. Lawlor. Therefore, defendant did not suffer prejudice from Mr. Hoof's performance at sentencing, and no relief is due. *See Miller*, 987 A.2d at 648.

C. *Aisha Williams Claims*

Defendant alleges that the Court erred in dismissing his claims regarding Commonwealth witness Aisha Williams. Statement of Errors at ¶ 5. In his Comprehensive Second Petition, defendant premised these claims entirely on testimony given by Ms. Williams at an evidentiary hearing regarding the PCRA petition filed by defendant's uncle and codefendant, Marvin Flamer. Comprehensive Second Petition at ¶¶ 58-60. In particular, defendant claimed that Ms. Williams'

---

[3] The ruling *in limine* was made prior to the assignment of this case to the undersigned judge.

testimony at the evidentiary hearing of Marvin Flamer, in which she recanted her trial testimony inculpating defendant, constitutes after-discovered evidence that entitles defendant to relief. *Id.* In addition, defendant claimed that Ms. Williams' contention at the hearing that she was compensated by the District Attorney's Office in exchange for her trial testimony, which had not been disclosed by the Commonwealth, established a *Brady* violation. *Id.* The PCRA court rejected these claims based on Ms. Williams complete lack of credibility at the evidentiary hearing. Defendant now contends that the PCRA court erred in rejecting the claims without an additional evidentiary hearing specifically directed to the claims of defendant. Statement of Errors at ¶ 5.

Defendant, however, proffered no evidence whatsoever in support of his claims apart from the testimony of Ms. Williams at the evidentiary hearing of Marvin Flamer. Because that testimony was completely incredible, it did not give rise to an issue of fact that would entitle defendant to an evidentiary hearing.

At defendant's trial, Ms. Williams testified that she had known defendant for a long time because they grew up in the same neighborhood, and that she recognized defendant as one of the men who walked up behind Mr. Moment and shot him. N.T. 1/15/14 at 176-177, 180-181, 188. Ms. Williams further testified that she gave complete and honest statements regarding the shooting to police in March 2008 and August 2008, and that she was hesitant to talk to police throughout the investigation and prosecution of Mr. Moment's murder because she was "scared for [her] life" and "felt bad" because defendants were from the same neighborhood as her. *Id.* at 182-88; *see* Commonwealth Exhibit C-15 (Williams March 2008 Statement) & Commonwealth Exhibit C-16 (Williams August 2008 Statement). Ms. Williams also stated that she recanted three times prior to trial, at preliminary hearings and at Hakim Bond's trial, because she did not

want to be deemed a snitch. N.T. 1/15/14 at 187-188. Prior to Ms. Williams' testimony at defendant's trial, a hearing was held due to Ms. Williams' request that the courtroom be cleared during her testimony. *See* N.T. 1/15/14 at 162-171. During that hearing, Ms. Williams stated she "[couldn't] go back to South Philly" where she and the defendants grew up, and that the defendants "got ways of having people do things." N.T. 1/15/14 at 167-168. At defendant's trial, Ms. Williams emphatically expressed her fear of defendants to the Court, and at no time did she express to the Court any fear of police. *See* N.T. 1/15/14 at 162-171.

However, Ms. Williams testified at Marvin Flamer's evidentiary hearing, almost nine years after defendant's trial, that she never gave a statement to police. *See* Marvin Flamer Evidentiary Hearing Notes of Testimony 12/9/22 at 66, 78 (hereafter, "M. Flamer Evidentiary Hearing Notes").[4] She stated that police concocted the March 2008 statement, that she did not remember giving the August 2008 statement, and that she never saw defendant when Mr. Moment was shot. M. Flamer Evidentiary Hearing Notes 12/9/22 at 66-70, 79-80, 88-89; M. Flamer Evidentiary Hearing Notes 12/14/22 at 28. Ms. Williams testified that she was never afraid of Marvin Flamer or defendant, and was actually always afraid of the police. M. Flamer Evidentiary Hearing Notes 12/9/22 at 70, 76. Additionally, Ms. Williams contradicted herself multiple times throughout the evidentiary hearing, including by testifying that she never signed any pages of the March 2008 statement, and then later admitting she had signed all but one page. M. Flamer Evidentiary Hearing N.T. 12/9/22 at 79-87. Ms. Williams further claimed at the evidentiary hearing that she had testified at defendant's trial that she had "never seen [Marvin]," when the notes of testimony from trial clearly established that was untrue. *See* M. Flamer Evidentiary Hearing N.T. 12/14/22 at 38-39.

---

[4] Co-defendant Marvin Flamer's case is at docket number CP-51-CR-0007716-2009. The evidentiary hearing for his PCRA petition was held on December 9, and December 14, 2022.

16

As to the alleged payments to Ms. Williams, she testified at the evidentiary hearing for Marvin Flamer that she had received a $5,000 check in exchange for her testimony at defendant's trial, and that she signed paperwork regarding the agreement. *Id.* at 63. However, Ms. Williams was unable to recall the specifics of who allegedly paid her in exchange for her testimony, and had no record of the paperwork she allegedly signed or the check that she allegedly received from the District Attorney's office. *See* M. Flamer Evidentiary Hearing N.T. 12/9/22 at 99-103.

Accordingly, the only evidence submitted in support of defendant's after discovered evidence and *Brady* claims was the incredible, often demonstrably false, and inherently contradictory, evidentiary hearing testimony of Ms. Williams at the Marvin Flamer evidentiary hearing. Having failed to proffer any other evidence in support of these claims, defendant was not entitled to an evidentiary hearing. No relief is due.

## V. CONCLUSION

For all the foregoing reasons, the Court's order dismissing defendant's Second Petition should be affirmed.

BY THE COURT:

_____
GLENN B. BRONSON, J

17

Commonwealth v. Nafeast Flamer
Type of Order: Opinion

CP-51-CR-0007713-2009

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P.114:

**Assistant District Attorney:**

Lawrence Goode, Esquire
Supervisor, Appeals Unit
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499

Type of Service:  ( ) Personal  ( ) First Class Mail  (**X**) Other, please specify: *Interoffice Mail*

**Defense Counsel:**

Edward J. Foster, Esquire                   Emeka Igwe, Esquire
1520 Locust Street, Suite 700               1500 John F. Kennedy Blvd., Suite 1900
Philadelphia, PA 19102                      Philadelphia, PA 19102

Type of Service:  ( ) Personal  (**X**) First Class Mail  ( ) Other, please specify:

**Additional Party:**

Letitia Santarelli, Esquire
Office of the Prothonotary - Superior Court
530 Walnut Street - Suite 315
Philadelphia, PA 19106

Type of Service  ( ) Personal  (**X**) First Class Mail  () Other, please specify:

**Dated:  July 1, 2024**

_Riley Cook_
Riley E. Cook, Esq.
Law Clerk to Hon. Glenn B. Bronson

3